### GUARDIAN SAVINGS & TRUST CO. v. DILLARD.

(Circuit Court of Appeals, Eighth Circuit. November 15, 1926.)

No. 7291.

**1. Appeal and error ⬅878(1)—Finding on issue not appealed from is not reviewable on appeal.**

Finding on issue adverse to contention of intervener, from which no appeal was taken, is not reviewable on appeal.

**2. Constitutional law ⬅143—Highways ⬅97¾, New, vol. 16A Key-No. Series—Statute providing for distribution of state funds to road improvement districts for retirement of bonds held not to impair obligation of contract (Harrelson Act Ark. §§ 21–23; Const. Ark. art. 2, § 17).**

Acts Ark. Sp. Sess. 1923 (known as Harrelson Act) pp. 27–32, §§ 21–23, providing for distribution of state funds to road improvement districts for retirement of district bonds, *held* not to apply to previous defaults, and did not impair obligation of contract of bonds, prohibited by Const. Ark. art. 2, § 17; state being under no obligation to give district money for such purpose.

**3. Highways ⬅147—Receiver for bondholders of road improvement district held empowered to collect assessments to pay defaulted bonds under resolution previously passed by district commissioners.**

Where commissioners of road improvement district passed resolution authorizing specified levies of assessed benefits for certain years for payment on bonds, receiver subsequently appointed under act creating district to collect assessments for bondholders had power to collect assessments under such levies, even if he

would not have had power to levy assessments as original act.

4. **Highways** ⚖️146—Where assessment for payment on road bonds, with amount contributed by state, exceeded liabilities maturing that year, property owner, paying at assessed rate under protest, held entitled to recover excess (Harrelson Act Ark. § 23).

Where assessment by commissioners of road improvement district for payment of coupons and principal of bonds exceeded amounts maturing in that year, *held*, that assessment should have been reduced by amounts contributed by state toward retirement of bonds, under Acts Ark. Sp. Sess. 1923 (known as Harrelson Act) p. 32, § 23, statute being mandatory in that respect, and property owner was entitled to recover excess over reduced rate paid under protest.

Appeal from the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Suit by the Guardian Savings & Trust Company against the Howard-Sevier Road Improvement District No. 1 and others, in which T. J. Dillard intervened. Decree for intervener, and plaintiff appeals. Affirmed.

Charles D. Frierson, of Jonesboro, Ark., for appellant.

James S. McConnell, of Nashville, Ark., for appellee.

Before STONE and LEWIS, Circuit Judges, and SYMES, District Judge.

STONE, Circuit Judge. In 1919, the Legislature of Arkansas perpetrated an orgy of local improvement legislation. It passed more than 600 separate acts, each authorizing the formation of a defined special district for the purpose of highway or drainage or levee improvements. Such districts were empowered to issue bonds. It has been stated that the total bond issues authorized under these acts totaled more than $120,000,000 and that bonds to the amount of about $68,000,000 were so issued. The result of the prosecution of these improvements was that very heavy tax burdens were placed upon the real estate subject thereto and much distress occasioned the owners thereof. The files of this court, alone, show frequent defaults in bond and other obligations and much difficulty in collecting these special taxes. Undoubtedly, the situation has been but faintly reflected here and it has evidently reached a condition of state-wide interest and concern.

Another consideration was that these improvements, in so far as highways were concerned, were by a great number of isolated districts acting independently and having only the needs of the particular district in view. The result was an utter lack of uniformity, plan or system of highways covering the entire state.

This situation so impressed the state Legislature that, in 1923, an act was passed, designed to remedy the entire matter. This was Act 5 of that session, commonly referred to as the Harrelson Act, approved October 10, 1923 (Acts of Ark. 1923, Spec. Session, p. 11). One of the provisions of that act was for the annual distribution of money, from a fund established by the act, to the various counties of the state in accordance with population. This distributed money was for two stated purposes: To apply upon bonded indebtedness of the road districts within the county and/or to go into the county highway improvement fund. In some named counties, the entire sum was for one purpose; in other named counties, the entire sum was for the county highway improvement fund; in the other counties, the sum was divided between the two purposes on percentage bases which varied and were stated as to each county. As to Howard county, 50 per cent. of the sum distributable annually was to be applied "for payment on bonds and interest coupons and 50 per cent. for the county highway improvement fund." Section 21, p. 28. As to Sevier county, the entire sum was "to be used exclusively for part payment on bonds and interest coupons." Section 21, p. 28.

Howard-Sevier Road Improvement District No. 1 was a road district authorized by one of the numerous acts in 1919. The district included lands, both in Howard and in Sevier counties. In 1920, the district authorized and sold bonds to the amount of $380,000 with attached semiannual interest coupons. In 1921, there was an additional issue amounting to $200,000. All of these bonds were secured by a deed of trust upon all of the benefits and revenues of the district, as authorized by the act creating the district. There was prolonged litigation over the validity of the assessments in the district which was not finally adjudicated until the Supreme Court of the state reversed the state trial courts of the two counties and sustained the validity of the assessments in October, 1924. In the meanwhile, few assessments were paid and the interest coupons falling due in 1921, 1922 and 1923 were largely in default.

The act creating the district provided for the appointment of a receiver if the bonds or coupons should come into default. In October, 1922, appellant, as the trustee for the bonds, filed its bill in the United States District Court alleging such default and a receiver was appointed October 22, 1923, and is yet

acting. The order of appointment was that the receiver "shall proceed to take possession of the books, papers, records, moneys and property of the defendant road improvement district, and hold the same subject to the orders of this court, and to proceed to collect the taxes due said district, and any state or federal aid money or other resources due the said district and to report to this court, and that all persons be enjoined from interfering with the custody and control of said receiver."

The above order was sought and issued in connection with the first bond issue. In September, 1924, an order of similar import was entered as to the second issue.

In November, 1921, and before the receivership proceedings, the board of commissioners of the district passed a resolution providing that, in order to pay the principal and interest of the two bond issues, payment of assessments for benefits should be divided into annual installments as follows:

"In each of the years 1921 to 1924, inclusive, 5 per cent. of the face of said assessed benefits producing $35,299.06 each year; and in each of the years 1925 to 1944, inclusive, 7.5 per cent. of the face of the assessed benefits, producing $52,948.63 each year."

When the receiver was appointed, in October, 1923, practically none of the assessments for the years 1921, 1922 and 1923 had been paid but were in suit in the chancery courts of the two counties. To these suits, the receiver was made party. Prior to December 1, 1923, the receiver caused to be delivered to the collectors of the respective counties a book showing the amount of assessment to be collected in 1924. Similar action was taken as to the assessments collectible in 1925. These amounts followed the above resolution of the board of commissioners.

In May, 1925, appellee, Dillard, who was the owner of land located in Howard county and within this district, paid these assessments due in 1924 and 1925. These payments were made under protest and duress. Shortly thereafter, he filed an intervention in the receivership proceeding. Therein he alleged the duress of payment and claimed, first, that the duty of levying these taxes annually resided solely in the board of commissioners and could not be exercised by the receiver; and, second, that if such authority existed in the receiver, the amount demanded of him was excessive because the receiver had received sums under the Harrelson Act which would equal 20 per cent. of the amount of bonds and coupons falling due in 1924 and 25 per cent. of those falling due in 1925 and the receiver

had applied such sums to payment of bonds and interest which had accrued prior to passage of the Harrelson Act instead of using such amounts, as required by that act, in reducing the respective levies for taxes collectible in 1924 and 1925; and that, had the receiver so properly applied these sums, the assessments against him would have been reduced by 20 per cent. and 25 per cent. respectively. Alleging this difference to be an unlawfully exacted overpayment, he sought refund of such excess.

The court found that the payments under the Harrelson Act, coming to the receiver for the taxes collectible in 1924 and in 1925 equaled 24 per cent. of the taxes collectible in those years; that such annual levies should have been reduced thereby (in accordance with the Harrelson Act, section 23); that such reduction would result in a corresponding reduction as to each individual assessment for those years and that intervener was entitled to refund of this excess of 24 per cent. collected from him. From an order to that effect, this appeal is brought by the trustee for the bonds.

[1] As the finding and order of the court was against the contention of intervener as to the authority of the receiver to make and collect any assessment and as he has not appealed therefrom, that issue is not reviewable here and we must treat this case as though that authority existed, although, for other reasons hereafter stated, that issue need not be determined under the facts here.

[2] The questions presented here are (1) whether the court properly construed and applied the Harrelson Act; and (2) if such construction and application be approved, whether that act, as applied to the facts of this case, is an impairment of the bond contract, forbidden by the Constitution. Both of these questions can be considered together. In approaching this discussion, we are aided directly by but one decision of the Supreme Court of Arkansas. The only case brought to our attention which has considered the Harrelson Act is Cone v. Hope-Fulton-Emmett Road Improv. Dist., 169 Ark. 1032, 277 S. W. 544. That case was concerned with an amendment (not involved here) to the Harrelson Act. The only part of that opinion relevant here, is as follows (page 546 [169 Ark. 1037]):

"The Attorney General contends that, if the act be construed as above indicated, it would violate article 2, § 17, of the Constitution, which prohibits the Legislature from enacting laws impairing the obligations of contracts. There is no merit in this contention. There is no contract between the bondholders

of road improvement districts and the state and federal governments under the Harrelson Law by which the revenue of these governments must be applied to the payment of bonds. The bonds are secured by levies or improvement taxes levied on the assessment of benefits on the lands according to the statutes under which the districts are created. If the state and federal governments, in aid of the taxpayers of improvement district taxes and the bondholders of the district, set apart a portion of their revenues to be applied on the payment of bonds, such act on the part of the sovereign is a gratuity rather than a contract."

The genesis of the Harrelson Act has been stated above. Generally, the act establishes a state highway commission "for the temporary period of ten years" (section 1, p. 16) with extensive powers to construct and maintain a designated system of "state highways"; creates a "state highway fund" (section 6, p. 19) and declares taxes on automobiles, gasoline and motor oil to provide such fund. A portion of section 33 (page 50) states that out of the first funds in excess of $1,500,000 (which is devoted to other designated uses) paid into the fund for each of the fiscal years ending July 1, 1924 and 1925, respectively, "there is contemplated the appropriation * * * of three million dollars, to be paid by the state highway commission to counties and road improvement districts as authorized by section 21 of this act." Sections 21, 22 and 23, with the above quotation from section 33, contain those portions of the act governing these distributive payments to counties or districts and which are involved here. Those sections are as follows (Act, p. 27):

"Section 21. The state highway commission shall, as soon as possible, ascertain the amount and dates of maturities of the principal of the valid, unmatured bonds outstanding on January 1, 1924; that have been issued by each road improvement district in the state at the time of the passage of this act for the purpose of improving the said public roads in the state, and which mature January 1, 1924; and thereafter in each year, beginning with the year 1924, as soon as sufficient funds are available for the purpose shall allot the sum of $3,000,000 or so much thereof as is available in the treasury by July 1st, to the respective counties of the state on the same basis that the population of each county bears to the population of the state of Arkansas as shown by the last official United States census. Each county's portion thus set aside shall be paid by the treasurer of the

state in the manner and for the purpose specified for each county.

"The counties whose portion is to be used exclusively for part payment on bonds and interest coupons are as follows: Class A— * * * Sevier * * * counties.

"The counties whose portion is to be used in the ratio of 90 per cent. for part payment on bonds and interest coupons and 10 per cent. for the county highway improvement fund are as follows: Class B—[certain named counties].

"The counties whose portion is to be used in the ratio of 75 per cent. for part payment on bonds and interest coupons and 25 per cent. for the county highway improvement fund are as follows: Class C—[certain named counties].

"The counties whose portion is to be used in the ratio of 50 per cent. for part payment on bonds and interest coupons and 50 per cent. for the county highway improvement fund are as follows: Class D— * * * Howard * * * counties.

"The counties whose portion is to be used in the ratio of 25 per cent. for part payment on bonds and interest coupons and 75 per cent. for the county highway improvement fund are as follows: Class E—[certain named counties].

"The counties whose portion is to be used in the ratio of 10 per cent. for part payment on bonds and interest coupons and 90 per cent. for the county highway improvement fund are classed as F—none.

"The counties whose portion is to be used exclusively for the county highway improvement fund are as follows: Class G—[certain named counties].

"It is further provided that in those counties, where all of the county's apportionment as set out in this act is paid to the county highway fund, the quorum court in such counties shall have authority by a majority vote of those present to set aside such part of the county's apportionment as it may be necessary to be applied as a part payment on bonds and interest coupons of road improvement districts and such part set aside for this purpose shall be divided among the several road improvement districts of the county on the same basis and it shall be paid in the same manner as is provided for those counties where the distribution is made by the state.

"Where all or any portion of the county's share of the appropriation specified in this section is to be used for part payment on bonds and interest coupons, warrants shall be sent by the auditor of state to the respec-

tive legal custodian of the funds of said road improvement district, in proportion to the amount of the principal of such valid, unmatured bonds outstanding on January 1, 1924, so issued by each·custodian of the funds of the respective districts may remit such warrants to the place of payment of such bonds and interest coupons with the remittance of the balance of the maturities of such ·bonds and interest coupons due in that year, so that the place of payment may have time to cash said warrants and have funds in cash to apply on the payment of such bonds and the interest coupons when payment is due. It is made plain that the pro rata allotment between road districts of each county of the county's portion of the appropriations set aside for part payment on bonds and interest coupons under provisions of this act, is based on the total of the principal of all bonds issued in the county at the time of the passage of this act and unmatured and unpaid on January 1, 1924; the annual payments by the state are to be applied on principal bonds or interest coupons maturing in the fiscal year for which the allotment is made.

"Where all or any portion of the county's share of the appropriation specified in this section is to be set aside for the county highway improvement fund, warrants shall be issued by the auditor of state to the respective county treasurers to the credit of the·county highway improvement fund for the amounts so due the respective counties and the treasurer of state shall pay said warrants when same are presented to him for payment. The funds thus paid into the county highway improvement fund shall be by the county court expended upon the public highways of said county and it shall be the duty of the county court to fairly and equitably apportion the funds. so paid into the county highway improvement fund at the option of said court among the various road districts and road improvement districts or road districts only in said county'for the purpose of constructing and maintaining the road, whether hard surfaced or earth road, and such apportionment shall be made by the county court after taking into consideration the relative importance of the roads in said county.

"Section 22. Immediately after the passage of this act, the state treasurer shall secure from the recorder of deeds in each county a copy of that portion of any deed of trust executed by a road improvement district securing its bonds, showing the amount and dates of the maturities of principal and interest of such bonds, which shall be filed in his office for public record, and from that information, and information on the same subject furnished him by the highway commission, the state treasurer shall compile a· record book showing the amounts and dates of all bonds heretofore issued by road improvement districts in this state; and it shall be the duty of secretary of every road improvement district in this state that may hereafter issue any bonds to furnish the state treasurer with a list of the maturities of principal and interest of such bonds, and the list so furnished the state treasurer shall be filed in his office for public record, and the contents thereof inscribed in the bond issue record book, hereinbefore provided for. Immediately after the passage of this act and before the first day of October in each year thereafter the secretary of each road improvement district in the state shall send to the state comptroller a statement, showing the financial condition of the district of which he is secretary, on which shall be shown the amount of outstanding bonds on July 1st of that year, the amount of any other outstanding indebtedness of the district, the amount of delinquent taxes, and the amount of cash on hand. The treasurer is authorized to employ an additional clerk at a salary of eighteen hundred dollars a year, payable monthly.

"Any recorder of deeds, or any secretary of any improvement district, who shall willfully fail or refuse to perform the duties herein required, shall be subject to a penalty of one hundred dollars ($100.00) for each offense, which shall be recovered by civil action instituted by the Attorney General in the name of the state and the venue of such action shall be in the county of the residence of the person sued.

"Section 23. On or before November 1st in the year 1923, and on or before September 1st in each year thereafter, the highway commission shall carefully and conservatively estimate the amount that will be certainly available before July 1st in the next calendar year. from the taxes and license fees, herein provided for, as a participation in the payment of the bonds issued by road improvement districts before the passage of this act, and shall certify to the county clerk of each county the amount in dollars and cents that will be available before July 1st of the next calendar year, as partial payment to apply on the outstanding bonds and interest coupons of the respective road improvement districts in that county maturing between July 1st of that year and July 1st of the year following; and it shall be the duty of each of such county clerks to file and safely keep such statements in the rec-

ords in his office, and to certify, under his hand and seal, to the secretary of each road improvement district in that county the amount in dollars and cents as shown by such statement that will be allotted to that road improvement district to be applied on the payment of bonds and interest coupons in that fiscal year as herein provided.

"Immediately after the receipt of such advice, the secretary shall call a meeting of the commissioners of such road improvement district, and said commissioners shall, by a proper resolution, or in other appropriate manner cause the tax in such road improvement district, collectible at tax paying time in the ensuing year, to be reduced against each tract of land in the district, pro rata in an aggregate amount equal to the amount in dollars and cents of the contribution to be made in the ensuing year, as herein provided for; provided, however, that such taxes shall not be reduced below a sum sufficient, when added to the state's contribution, herein provided for, to produce enough to certainly meet the maturities of principal and interest of the bonds of such district maturing between June 30th of the ensuing year and the year following; and, provided further, that nothing herein contained shall impair the obligations of any of said bonds or the duty of such commissioners and all other officers having to do with the levying, extending and collecting taxes sufficient to promptly pay all maturities of principal and interest of the bonds issued by said district. The term 'road improvement district' shall not include improvement districts in cities or towns."

These quoted sections define the purpose of the state to give financial aid to existing road districts. This aid is to be by annual payments from a maximum annual fund of $3,000,000 apportionable among the counties in accordance with population. Two general purposes for which this money may be used are definitely stated and are (1) to construct and maintain roads and (2) to aid in retiring existing bonded indebtedness of districts. These purposes are expressly defined as to each particular county. As to the two counties involved here, the entire payments to Sevier county and 50 per cent. of those to Howard county are to be devoted to retirement of existing bonded indebtedness. The payments to retire bonds are to apply to certain described bonds and to those alone and are to affect the amount of annual taxes assessed for prescribed years. That is, "the annual payments by the state are to be applied on principal bonds or interest coupons maturing in the fiscal year for which the allot-

ment is made" (section 21) and the district commissioners (upon certification of the amount the district will so receive at the beginning of a fiscal year) shall "cause the tax in such road improvement district, collectible at tax paying time in the ensuing year, to be reduced as to each tract of land in the district, pro rata in an aggregate amount equal to the amount in dollars and cents of the contribution to be made in the ensuing year," with two provisos to be hereafter noted. It is clear that the act contemplated no application of such payments upon bonds or coupons in default at the time the act was passed or to such as might come into default for any other fiscal year than that in which the particular payment was made. As to such defaults, the situation and condition of the districts was left wholly unchanged. In this respect, the act was entirely prospective and definite in its effect. The bondholders, the district and the landowners affected thereby have the right to require the specific and sole application of such payments which is prescribed and required by this act. There is no obligation or duty upon the state to make any payment at all and when it does so voluntarily it can prescribe the precise conditions and application and it has done so in this act. Those payments cannot be diverted to any purpose not designated.

This situation is unaffected by the provisions in the bonds and pledge therefor to the effect that the bonds are secured by a first lien, not only upon taxes, but upon "the entire revenues of the district from whatever source derived." The just quoted wording is a part of the contract between the bondholders and the district and cannot be impaired even by the state; but, broad and inclusive as that language is, it must be construed in a rational way to carry out the intention of the parties. If the state or any one else under no legal obligation to the district wishes to give the district money for a specified purpose and usage, it would be absurd to hold that the district is powerless to accept and so apply the gift because of this contract with the bondholders. They are beneficiaries, indirectly, from such gifts because such enhance the value of the security back of the bonds. This re-reasoning is accentuated and made conclusive where the gift is, as here, required to be applied upon the bonds themselves. There is no foundation for the contention that such action is, in this respect, an impairment of the bond contract. Nor is there any impairment thereof otherwise. This act does not, in its operation, disturb the existing security back of the bonds nor prevent the levy of sufficient

annual tax to pay the bonds, nor affect any rights or remedies of the bondholders. On the contrary, the act expressly provides in this same section of the act (23) "that nothing herein contained shall impair the obligations of any of said bonds or the duty of such commissioners and all other officers having to do with the levying, extending and collecting taxes sufficient to promptly pay all maturities of principal and interest of the bonds issued by said district." Its effect is simply this, that when the commissioners of a district have determined that a certain tax rate is necessary for a given fiscal year to meet the bonded indebtedness, that rate shall be reduced by the amount of the payment to the district for that year by the state. Even in estimating this rate, so affected, the act carefully and expressly requires that such reduction shall be made: "Provided, however, that such taxes shall not be reduced below a sum sufficient, when added to the state's contribution, herein provided for, to produce enough to certainly meet the maturities of principal and interest of the bonds of such district maturing between June 30th of the ensuing year and the year following" (section 23). The last quoted provision is no authority limiting the annual tax assessment to the amount deemed necessary to pay the bonds and coupons falling due in the particular year but it is a *minimum* which the district must levy before it can reduce that levy by the contribution from the state. There is nothing in this act to prevent the district making an annual levy sufficient to cover the bonds and coupons maturing, other expenditures by the district and defaults theretofore accruing on bonds. Its powers in that regard are governed by other applicable laws and legal conditions, none of which are in the slightest affected by this act.

[3] Having in mind what has been said above as to the purpose and scope of the Harrelson Act, we consider the facts controlling this particular assessment. It is not necessary to consider whether the receiver had power to levy, as an original act, the assessments for these two years in question. The board of commissioners of the district had, before the receivership, provided for and authorized a levy of 5 per cent. of the benefits for a series of years which included the fiscal year 1924 and of 7.5 per cent. for another series of years, which included 1925. That resolution was unchanged and in full force at the time of these levies. The validity of those rates so established by the board is challenged by appellee upon the theory that the board had, in its resolution, established the annual rate

of levy for years into the future (during the maturity of the entire bond issue) and that it had no power to provide for a rate of levy for future years. There is no such limitation upon the power of the board to be found in the act creating the district. While there might be some ground for the bondholders to contend (a matter not here for consideration) that the annual rates thus established could not be reduced, yet, we have no doubt that the board could, at any time, have increased these rates for any prospective year and that until so changed, those rates thus established were legally fixed and collectible. House v. Road Improv. Dist. No. 2, 158 Ark. 330, 346, 251 S. W. 12 (affirmed 266 U. S. 175, 45 S. Ct. 60, 69 L. Ed. 229); Jefferson v. Conway County Bridge Dist., 147 Ark. 518, 227 S. W. 769. As the receiver was empowered, under that act, to collect assessments and as the rates, for these years sought to be collected by the receiver, were identical with those so fixed by the board for those years, we find it unnecessary to consider whether those rates were fixed or adopted by the receiver as an independent determination and we are certain that the status of those rates has not been changed by the receivership or by anything shown in this record. For all practical purposes pertaining to this controversy, they stand, in this respect as to this case, as though no receivership had intervened.

[4] So regarded, how were these rates affected by the circumstance that in each of these two years there was a contribution to the district from the state, under the Harrelson Act, applicable to bond payments? These state contributions were made for the fiscal years beginning July 1, 1924 and 1925, respectively. During the fiscal year of 1924, interest coupons aggregating $31,000 matured. During the fiscal year of 1925, interest coupons and principal bonds aggregating $41,725 matured. The 5 per cent. rate on benefits, established by the board, for 1924, and the 7.5 per cent. rate for 1925, equalled $35,299.06 and $52,948.63 respectively. Each of these amounts is more than the coupons and bonds maturing in the particular year. Thus the above minimum requirement of the Harrelson Act (section 23) was met. As this was the only condition (under that act) limiting the reduction of taxes for those years by the amounts contributed to the district under that act and as this reduction is mandatory, if the benefits of that act are to be received, we think the trial court was right in concluding that those assessments should have been so reduced. As appellee was compelled, under protest and legal duress, to pay the entire

rate, it must follow that the receiver should return to him this difference because it was illegally collected.

The above conclusion does not prevent appellant from resorting to any remedy open to it, before and irrespective of the Harrelson Act, to raise money in the district to pay the defaulted bonds and coupons and in no way affects the security for the payment of the bonds and coupons, whether in default or not.

The decree should be and is affirmed.