Application of the OKLAHOMA TURNPIKE AUTHORITY for the Approval of not Exceeding $190,000,000 Oklahoma Turnpike System Revenue Bonds for the Construction of Section B of the Eastern Turnpike, the Muskogee Turnpike and an Administration Building and the Refunding of the Turner Turnpike Bonds, the H. E. Bailey Turnpike Bonds and Section A of the Eastern Turnpike Bonds.

No. 42009.

Supreme Court of Oklahoma.

July 14, 1966.

Rehearing Denied July 27, 1966.

Cook, O'Toole, Ming & Tourtellotte, by H. Dale Cook, Oklahoma City, McKeever, Glasser, McKeever & Conrad, by Douglas McKeever, Enid, R. L. Vaughan, Oklahoma City, for Oklahoma Turnpike Authority.

James W. Bill Berry, Morton Y. Loar, Oklahoma City, for C. E. McCaughey.

William N. Christian, pro se.

Crawford D. Bennett, Jr., pro se.

DAVISON, Justice.

This is an original proceeding in this court instituted by application of the Oklahoma Turnpike Authority for approval of the issuance of not to exceed $190,000,000 of Oklahoma Turnpike System Revenue Bonds dated January 1, 1966. The application for such approval is filed pursuant to legislative authorization set forth in 69 O.S.1961, Sec. 668. Notice of the hearing of the application was duly given in accordance with the provisions of said Sec. 668.

Protests to the approval of the bonds have been filed by Crawford D. Bennett, Jr., William N. Christian and C. E. McCaughey.

The funds from the sale of the bonds, with other available funds, are to be used principally for the following purposes: (1) construction of a turnpike project designated as "Section B of the Eastern Turnpike" extending from McAlester to Hugo, Oklahoma, (2) construction of a turnpike project designated as the "Muskogee Turnpike" extending from Broken Arrow to Interstate Route 40 near Webbers Falls by way of Muskogee, Oklahoma, (3) construction of an Administration Building for use of the Authority in administering all turnpike activities, (4) refunding the outstanding bonds of the Turner Turnpike, (5) refunding the outstanding bonds of the H. E. Bailey Turnpike, and, (6) refunding the outstanding bonds of Section A of the Eastern Turnpike. Upon approval of the proceedings of the Authority and of the issuance of the bonds, the Authority proposes to combine the projected turnpikes and those being refunded, supra, into one turnpike system for administration and operation as a single turnpike project, to be known as the "Oklahoma Turnpike System."

The Will Rogers Turnpike is not made a part of the "Oklahoma Turnpike System" and its bonds are not included in the refunding plan.

The Protestant Bennett is the owner of some Turnpike Authority bonds issued in connection with the Northeastern Turnpike herein referred to as the Will Rogers Turnpike, extending from Tulsa, northeastward to a point close to the Missouri State line near Joplin, Missouri. These bonds are dated December 1, 1954. On application of the Authority these bonds were approved by this court in Applications of Oklahoma Turnpike Authority, Okl., 277 P.2d 176, promulgated December 7, 1954. At the time such bonds were issued the Turner Turnpike, extending from Oklahoma City to Tulsa, had already been constructed. The Turner Turnpike bonds were approved in

Application of Oklahoma Turnpike Authority (1950), 203 Okl. 335, 221 P.2d 795, and Application of Oklahoma Turnpike Authority (1952), 206 Okl. 617, 246 P.2d 327.

■ Protestant Bennett contends that his bonds are entitled to the benefit of the security furnished by what is now 69 O.S. 1961, Sec. 667, which provides, inter alia, that any paid-out turnpike project shall be continued in operation as a toll facility for the benefit of the other turnpikes until all bonds issued by the Authority have been paid. It is his position this amounted to a pledge of revenue and that the refunding of Turner Turnpike and the combining thereof with the others and their participation in the tolls from paid-out turnpikes, dilutes the funds that the Will Rogers Turnpike would otherwise receive from such paid-out projects, and amounts to impairment of the vested right of holders of Will Rogers Turnpike bonds. He cites decisions in which this court approved the pledge of these funds in behalf of turnpike bonds issued subsequent to the Will Rogers Turnpike bonds. In particular he relies upon Application of Oklahoma Turnpike Authority, (1963), Okl., 386 P.2d 165, involving a covenant against impairing the security of bonds for Section A of the Eastern Turnpike derived from revenues of paid-out projects, and limiting use and application thereof to named turnpike projects including Will Rogers Turnpike. We point out that in the cited case the covenant and limitation in the trust agreement then under consideration was only to and for the benefit of Section A of the Eastern Turnpike, and that the reference to Will Rogers Turnpike was, at most, a recognition of any rights it could have in such future revenues.

The principal defect in Protestant Bennett's contention is that he assumes the provisions in Section 667, providing that any paid-out project shall continue as a toll facility for the benefit of other turnpike bonds, were in existence prior to the date (Dec. 1, 1954) of the Will Rogers Turnpike bonds. He is in error. The 1953 Legislature (Session Laws 1953, p. 367) re-

enacted the previously existing statute (69 O.S.1951, Sec. 667), and this statute and other turnpike legislation was by referendum submitted to a vote of the people and adopted January 26, 1954. As thus adopted, the statute was as follows:

"When all bonds issued under the provisions of this Act [in connection with any turnpike project] and the interest thereon shall have been paid or a sufficient amount for the payment of all such bonds and the interest thereon to the maturity thereof shall have been set aside in trust for the benefit of the bondholders, such projects, if then in good condition and repair to the satisfaction of the State Highway Commission, shall become part of the State Highway System and shall thereafter be maintained by the State Highway Commission free of tolls."

Thereafter the 1955 Legislature (Session Laws 1955, p. 415, Sec. 5. Approved May 25, 1955, (Emergency) amended the statute to provide that any paid-out turnpike project was to continue as a toll facility until all bonds of the Authority and interest thereon had been paid, and further providing a formula for distribution of such revenues to other turnpike projects. 69 O.S.1961, Sec. 667. It is therefore apparent that the statutory provision relied upon by Bennett did not exist on the date of the Will Rogers Turnpike bonds and therefore could not be considered as constituting a contractual revenue provision of such bonds. Since these bonds had acquired no contract rights thereto, the accrual of prospective future revenues of any paid-out projects was subject to change by the Authority, provided the change was the result of some action the Authority was empowered to perform. Under the provisions of 69 O.S.1961, Sec. 669, as amended Laws 1965, c. 407, Sec. 7, p. 790 (60 O.S.Supp.1965, Sec. 669) the Authority was authorized to refund outstanding turnpike bonds, and under 69 O.S.1961, Sec. 659, as amended Laws 1965, c. 407, Sec. 4, pp. 787, 788 (69 O.S.Supp.1965, Sec. 659) the Authority was authorized to combine two or more turnpike projects into one unit.

No authorities are cited in the briefs that contain the particular situation and proposition presented to this court. However, we believe that the effect of the Authority's lawful acts is analogous in principle to the right of the State to control the use and disposition of its property and funds without impairment of the contractual obligations of its bonds, except in those instances where contract rights have been acquired to the particular property or funds. 16 C.J.S. Constitutional Law § 289, p. 1310. See Guardian Savings & Trust Co. v. Dillard, 8th Circuit, 15 F.2d 996, 998, 999, 1001; Cone v. Hope-Fulton-Emmett Road Improvement Dist., 169 Ark. 1032, 277 S.W. 544, 546; Michaels v. Barrett, 355 Ill. 175, 188 N.E. 921.

It is our conclusion that Protestant's contention is without merit and that there was no impairment of the contractual provisions of Will Rogers Turnpike bonds as prohibited by Art. 1, Sec. 10, of the United States Constitution and Art. 2, Sec. 15, of the Oklahoma Constitution.

The Protestant Christian contends that the Turnpike Act (69 O.S.1961, Secs. 651–687, with amendments) as construed and applied by the Authority in its application and proceedings, violates the equal protection of the law provision of the Fourteenth Amendment to the Federal Constitution and the local and special law prohibition of Art. 5, Sec. 59, of the Oklahoma Constitution. It is urged that the exclusion of Will Rogers Turnpike bonds from the refunding is discrimination within a class, in that it gives those being refunded the cumulative support of their revenues. No authorities other than the above constitutional provisions are cited to support the legal proposition advanced by Protestants.

The Protestant Bennett makes a similar contention in his argument that the Authority should include the Will Rogers Turnpike bonds in the refunding. We believe that the proposition of whether it was, or was not, practical to include such bonds

in the refunding would be a matter largely and probably entirely within the discretion of the Authority. We note from the record that in the matter of interest the rate is considerably less on the Will Rogers Turnpike bonds than it is on the bonds of the H. E. Bailey Turnpike and Section A of the Eastern Turnpike. It appears that the rate of interest on the Will Rogers Turnpike bonds is practically the same as that on the Turner Turnpike bonds. There could be other valid reasons why the Authority chose to not include Will Rogers Turnpike in the refunding. We must assume that it was the Authority's considered judgment upon study of all the factors that the refunding should not include Will Rogers Turnpike.

The arguments in support of such contentions appear to assume that the individual turnpikes are collectively a single unit. This is not correct. Each of the presently existing turnpikes and their bonds were the result of separate projects of the Authority at different times with their own individual rates of interest, principal amounts, maturity dates, redemption provisions and security. In these aspects each was the result of its own particular situation. The common feature that the turnpikes have is the stated purpose in the Act "to facilitate vehicular traffic throughout the State" (69 O.S.Supp.1965, Sec. 651) by the specific methods stated therein. For this reason we held in Application of Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795, that the Act was a general law and not a local or special law as contemplated by Art. 5, Sec. 46, of the Oklahoma Constitution. However, once the turnpikes were separately conceived, financed and constructed, as above set out, they retained their separate status with the revenues and security provided for them, until such separate status was lawfully changed by combining two or more into a single unit.

We fail to see in what manner the Will Rogers Turnpike and its bonds have been deprived of the equal protection of the law or that there is any element of a local or special law in the Act and the proceedings of the Authority.

◼ The Protestants Christian and Bennett assert that the Turnpike Act denies due process of law and by oral argument and brief contend that the provisions of the Act as to notice of presentation and hearing of the application for approval of the present bonds by this court violates the due process clause of Art. 2, Sec. 7, of the Oklahoma Constitution and the Fourteenth Amendment to the United States Constitution.

Under the provisions of 69 O.S.1961, Sec. 668, the Authority is empowered to make application to this court for approval of any bonds issued under the Act and required 10 days published notice of the hearing thereon to inform all interested persons that they may protest the issuance of such bonds and be present and contest the validity thereof. Such notice was duly given and a hearing was held by this court and Protestants have filed briefs herein in support of their respective protests.

In the previously cited decision of Application of Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795, 811, 812, this contention, that the Act violated due process of law, was thoroughly discussed, and we held that:

"The provisions of the Oklahoma Turnpike Act authorizing this proceedings in this court do not constitute violation of any constitutional provision as to due process of law."

This discussion and conclusion are reaffirmed and the present contention is found to have no merit.

◼ The Protestants Christian and McCaughey further contend that the Authority is subject to the provisions of the Administrative Procedures Act of 1963, 75 O.S.Supp.1963, Secs. 301–325. They urge that under that Act the Authority was required to adopt rules and regulations providing for notice and hearing before it of those matters which were considered and resulted in its determination to take the ac-

tions set forth in the present application, supra. The Authority strongly urges that it is not subject to the Administrative Procedures Act.

The Turnpike Act is comprehensive in its expression of the powers and duties of the Authority in the accomplishment of the purposes for which it was created. The Act vests in the Authority considerable discretion, within the limits of the Act, in determining the feasibility of authorized turnpikes, the issuance of bonds, refunding bonds, and combining of turnpikes. The Act provides procedure for filing an application in this court for approval of any bonds to be issued thereunder, and exclusive jurisdiction is conferred on this court to hear and determine each such application, with notice thereof and an opportunity for filing protests. We have held, supra, that this constitutes due process. The Act specifically provides in 69 O.S.1961, Sec. 671, as follows:

"The foregoing sections of this Act shall be deemed to provide an additional and alternative method for the doing of the things authorized thereby, and shall be regarded as supplemental and additional to powers conferred by other laws, and shall not be regarded as in derogation of any powers now existing; provided, however, that the issuance of turnpike revenue bonds or turnpike revenue refunding bonds under the provisions of this Act need not comply with the requirements of any other law applicable to the issuance of bonds."

It is our conclusion that under these circumstances the Legislature evidenced an intent to exclude the Authority from the provisions of the Administrative Procedures Act.

■ The Protestant Christian further contends that 69 O.S.Supp.1965, Secs. 680, 682, 683, whereby a part of the motor fuel excise taxes (68 O.S.1961, Secs. 659a, 659b) is apportioned to the Authority for use and pledge to the payment of interest and principal of turnpike bonds, violates Art. 10, Sec. 19, of the Oklahoma Constitution, which provides that "no tax levied and collected for one purpose shall ever be devoted to another purpose." Protestant argues that this use of the tax is not for "construction, repair and maintenance of State Highways" (Sec. 659b, supra) and violates the constitutional provisions.

This contention is directly contrary to the prior decisions of this court. In Application of Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795, 809, 810, after discussion and citation of authority, it was held that the fact that tolls were charged for the use of a turnpike did not affect its status as a "public highway." In Application of Oklahoma Turnpike Authority, Okl., 365 P.2d 345, 354, where the use of the apportioned fuel tax was limited by the statute to payment of interest on the bonds, we said that the principal and interest on the bonds were not separable, and held payment of the interest was an integral part of the expense of construction, maintenance and repair of the turnpike. Therein we quoted from Application of Oklahoma Turnpike Authority, Okl., 359 P.2d 680, 688, as follows:

" 'Turnpikes have been held to be public highways. Application of Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795. The above use of the stated portion of motor fuel tax funds is therefore used for public highway construction, and in fact is a use for public highway purpose.' "

We can discern no legal distinction between the above situation and the present circumstances, where the bonds are to be used to refund existing turnpike bonds and to construct additional turnpikes. Without bonds no turnpike would be constructed. They must be maintained and repaired. The apportioned part of the fuel tax funds, if and when used, will be for public highway purposes.

■ It is further urged by the Protestant Christian that the second portion (enacted 1955, supra) of 69 O.S.1961, Sec. 667, providing that so-called "paid-out" turnpike projects shall continue to be operated as a toll facility until all bonds of the Authority

and interest shall have been paid, and such revenues used and applied in behalf of other turnpike projects according to a prescribed formula, creates a debt or obligation against the State in violation of Art. 10, Sec. 23, of the Oklahoma Constitution. This contention is based on the dissenting opinion in Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510, set forth at pp. 530, 531. The rationale of such dissent was that under the first part of said Section 667 (reenacted 1953, supra), providing "paid-out" turnpike projects shall become a part of the State Highway System and maintained free of tolls by the Highway Commission, the State had a vested right in the previously constructed Turner Turnpike and Will Rogers Turnpike and their continuance as a toll facility created a debt or obligation against the State.

In Application of Oklahoma Turnpike Authority, Okl., (1961) 359 P.2d 680, and in the above cited case, 348 P.2d 510 (1960), we approved a pledge of the tolls of such "paid-out" projects in behalf of bonds of the turnpike projects therein involved, stating, inter alia, (348 P.2d 510 at 519) as follows:

"When tolls collected for travel on a Turnpike are used for construction and maintenance of that same Turnpike such funds are exclusively used for public highway purposes. When such tolls are so used for the benefit of other Turnpikes there is similar exclusive use for public highway purposes.

"This plan will benefit the State by hastening the time when all Turnpikes may be finally turned over to the State Highway Department and will extend the time of maintenance of Turnpikes from tolls without payment thereof by Highway Commission out of general highway funds. This will leave more of the general highway funds for use on other public highways while the Turnpikes will continue to be well maintained."

The Legislature has not elected to change said Sec. 667 at any of its sessions held since we expressed our interpretation thereof in the above decisions. The answer to Protestant's contention is that the State has elected to forego or delay, at least for the time being, the acquisition of a toll free highway with the attendant expense of maintenance and repair, to the end that the continued tolls be used for public highway purposes and the State thereby benefit by accomplishing the purposes (69 O.S. Supp.1965, Sec. 651) of the Turnpike Act and by ultimately acquiring valuable additions to its State Highway System.

It is further urged by the Protestant McCaughey that:

"All that portion of the trust indenture and of 69 O.S.Supp.1965, Sec. 680, (S.L. 1965, p. 790) purporting to authorize a permanent pledge of up to $3,000,000 per year in gasoline taxes to pay principal and interest on turnpike bonds is unconstitutional, since it would create future state debt, and obligate future tax revenues, in violation of Art. 10, Sec. 23, Oklahoma Constitution."

Article 10, Sec. 23, of our Constitution provides:

"The State shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the State, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, * * *"

He concedes that if this proposition is sustained we must of necessity overrule our contrary holding in Application of Oklahoma Turnpike Authority, Okl., 365 P.2d 345.

 Protestant Christian makes the same contention and also urges that Secs. 680 and 683 constitute a donation to turnpike bondholders in violation of Art. 10, Sec. 15, of the Oklahoma Constitution.

Senate Bill 238 (Session Laws 1965, pp. 790, 791 and 792, amended 69 O.S.1961, Secs. 680 and 683.

Section 680 now provides in part as follows:

"(a) Until all bonds of the Authority and the interest thereon are paid in full, the Oklahoma Tax Commission shall each

month determine an amount equal to the motor fuel excise taxes computed on ninety-seven and one-half per cent (97½%) of the total gallonage of all fuels consumed, during the calendar month in which the tax being apportioned accrued, on all Oklahoma turnpike projects and apportion a sum equal to said amount from all gasoline tax collections as follows: Ninety-seven per cent (97%) of such amount to the Oklahoma Turnpike Authority. * * *"

Section 683 now provides as follows:

"(a) Motor fuel taxes on fuels consumed on Oklahoma turnpikes and apportioned to the Oklahoma Turnpike Authority are declared to be revenues of the Oklahoma turnpikes, since they are derived directly from the operation of such turnpikes, and are subject to pledge by the Oklahoma Turnpike Authority in the same manner as tolls and other revenues of said turnpikes may be pledged, as security for turnpike revenue bonds hereafter issued. The Oklahoma Turnpike Authority shall segregate and hold such motor fuel excise taxes apportioned to it and all funds heretofore or hereafter accumulated in the Trust Fund in trust for the uses and purposes herein provided.

"(b) The deposits in this Trust Fund may be expended or pledged by the Oklahoma Turnpike Authority, as it may deem proper, either in whole or in part, for making up any deficiency in the moneys available to meet interest and principal requirements on turnpike bonds hereafter issued and for such purpose it may vest in the holders of any such bonds a contract right to the continuance of those apportionments to the Oklahoma Turnpike Authority provided in § 680 hereof but subject to the limitations therein (provided, that no such pledge or vesting of said contract right shall be deemed to restrict in any way the State's power to change the rate of the motor fuel tax levy or to repeal said levy) and for the payment of necessary expenses in the financing of additional turnpikes. Any

such expenditure or pledge shall be subject to any prior pledge of any portion of the funds in, or to be deposited to, the Trust Fund. Provided, that any funds expended as permitted herein shall, upon payment of all interest and principal of all bonds issued hereunder, and before delivery of any said turnpike to the State of Oklahoma Department of Highways, be replaced in said Trust Fund by said Authority, and upon the completion of said reimbursement, said Trust Fund shall terminate and the balance in said Trust Fund shall be delivered to the State of Oklahoma Department of Highways.

"(c) Any funds in the Trust Fund not expended or pledged by the Authority shall be transferred by the Authority to the State Highway Department in such amounts and at such times as the Authority shall determine."

It is pointed out that in 69 O.S.Supp.1965, Sec. 651, it is stated turnpike revenue bonds are payable solely from revenue. This is restated in 69 O.S.1961, Sec. 652, with the additional provision that bonds shall not be deemed to constitute a debt of the State or a pledge of the faith and credit of the State, and that the bonds shall state on their face that neither the State nor the Authority shall be obligated to pay the same or the interest thereon except from the revenues of the projects. The prior Acts of the Legislature reflect a process of progressive legislation enlarging the scope of revenues available to the Authority, and evidencing the State's interest in turnpike projects. The constitutionality of these statutes has been upheld in the decisions cited herein. The latest legislative amendment, supra, has additionally empowered the Authority to pledge the apportioned motor fuel tax for making up deficiencies in moneys available to meet principal requirements on turnpike bonds.

In the cited case (365 P.2d 345) we upheld the validity of practically the same identical provisions in the prior law authorizing the pledge of such tax to pay interest on the bonds. Therein we reviewed the prior

decisions of this court and denied the same attacks on the constitutionality of that law as are made against the present law, supra. There is no difference in principle between the two legislative enactments. In that case we sustained the legislative declaration that the apportioned motor fuel taxes were revenues of the turnpikes on the ground that the turnpikes generate or produce vehicular traffic within the State and a consequential consumption of fuel on which the tax is paid and apportioned to the Authority for liquidation of the project debt. We stated, inter alia, as follows:

" * * * When one travels upon a turnpike in this state, his automobile consumes gasoline upon which, presumptively, he has paid a tax. It is the travelling upon the turnpike that requires the purchase of fuel which result in the payment of the motor fuel tax. Without the turnpike there would not have been the travelling and resulting tax. The turnpikes provide the means for the consumption of the fuel on which the tax is paid. If there is no vehicular travel on the turnpikes, no revenue is apportioned to applicant. The turnpikes must generate or produce traffic to receive revenue.

\* \* \* \* \* \*

" * * * Before the average motorist could travel across this state he would have to refuel, thereby replacing the gasoline consumed on a turnpike and, no doubt, would leave the state with gasoline in his tank purchased in this state.

\* \* \* \* \* \*

" * * * reason dictates that many travellers come through this state because of the turnpikes and purchase much more gasoline here than they consume on the turnpikes. The taxes on such excess gallons of fuel could well offset the tax apportioned to the applicant, and make up to the State Highway Department any losses of fuel taxes for those vehicles which would have travelled state highways if the turnpikes had not been available.

\* \* \* \* \* \*

" * * * The apportionment of gasoline taxes to the trust fund here involved is neither a loan of state credit nor a gift. In the first place, the bonds are to be paid from the revenues to be produced by the facility. The gasoline taxes apportioned to the Authority are revenues earned by it, paid by users of the turnpikes for the use thereof. They are such revenues by enactment of law and in fact. They, then, are not a gift from any one to any one else."

In the legislative enactment involved in the cited case and in the present law (Sec. 683, supra) there is provision that no such pledge or vesting of contract right shall be deemed to restrict in any way the State's power to change the rate of the motor fuel tax levy or to repeal said levy. Thereby the taxing power of the State remained unaffected. For this reason we held (365 P.2d 345, 353) that the case of Boswell v. State, 181 Okl. 435, 74 P.2d 940, was not in point, because the statute involved in that case purported to deprive future legislatures of their right to repeal the law levying the tax pledged, and for the further reason that those bonds were not the subject of a self-liquidating project.

Protestant McCaughey strongly relies on State ex rel. Washington State Finance Committee v. Martin (1963) 62 Wash.2d 645, 384 P.2d 833, as demonstrating the lack of legal foundation for our conclusions in 365 P.2d 345, and as grounds for overruling that decision prospectively. In the Washington case the court had previously approved the issuance of bonds with which to pay a World War II Veterans' Bonus, to be funded by excise taxes on cigarettes. The approval of such bonds was based in part on the proposition that the bonds were not a debt of the State of Washington because the act authorizing the bonds created a special fund for their redemption. The Washington court overruled its prior decision approving the bonds, but made the effect thereof only prospective. The case is not in point or even persuasive, for the obvious reason that the circumstances do

not even faintly reveal the existence of a self-liquidating project whereby funds are generated and produced for the liquidation of its bonds.

The authorities relied upon to sustain our conclusions in 365 P.2d 345 are cited and quoted from and it would be mere repetition to include them herein. Reference is made thereto and they are reaffirmed as sustaining our conclusion herein that the statutes, supra, do not violate Art. 10, Sec. 23, and Art. 10, Sec. 15, of the Oklahoma Constitution.

We now come to a consideration of the matters and propositions presented by the Authority's Application.

The original Turnpike Act was Senate Bill No. 225, enacted by the 1947 Legislature, Session Laws 1947, p. 478. It was thereafter amended and re-enacted in various respects at later legislative sessions. In its present form the Turnpike Act appears as 69 O.S.1961, Secs. 651–687, as amended by Senate Bill No. 238 of the 1965 Legislature, 69 O.S.Supp.1965, Secs. 651, 654, 655, 659, 661, 665, 669, 680, 682, 683, 686, 688. Pursuant to the above legislative authority the Authority issued bonds in 1950 for construction of the Turner Turnpike, and in 1961 for construction of the H. E. Bailey Turnpike, and in 1963 for construction of Section A of the Eastern Turnpike. The bonds are secured pursuant to the terms of separate and respective Trust Agreements executed in connection with the issuance of said bond issues. The Legislature, 69 O.S.Supp.1965, Sec. 655(e) (4), (6), has empowered the Authority, upon determining the same to be feasible and economically sound, to construct a turnpike project between McAlester and Red River south of Hugo (Section B of Eastern), and Muskogee Turnpike extending from Broken Arrow southeast via Muskogee to a junction with Interstate Highway 40.

As first herein stated, the Authority proposes to issue $190,000,000 in bonds and use other available funds for the purpose of refunding the outstanding bonds of the three above named existing turnpikes, and

to construct Section B of the Eastern Turnpike and the Muskogee Turnpike, and to construct an administration building for use in administering the affairs of all turnpikes. Such bonds to be dated as of January 1, 1966, with an interest rate not exceeding 5% per annum, and maturing not later than January 1, 2006. These turnpikes are to be combined into a single unit. The Authority further proposes to pay to the Oklahoma Department of Highways from the proceeds of the bonds the sum of $2,454,000 for cost of constructing an additional two lane roadway from the proposed Hugo South By-Pass to the Red River and one-quarter of the cost of an additional 28 foot roadway bridge over the Red River, called the Hugo-Red River Improvement. In connection with the issuance of such bonds a Trust Agreement (69 O.S.1961, Sec. 660) is to be executed to secure the performance of the conditions and agreements in said bonds.

The record reflects that on May 5, 1966, the Authority duly adopted resolutions covering the matters and things proposed to be done and accomplished by the Authority. The record further reflects that the Authority considered engineering reports and traffic reports concerning the turnpikes to be built and determined that the location thereof was as required by law and that such projects were feasible and economically sound as required by 69 O.S.Supp.1965, Sec. 655.

The application of the Authority presents the question of the validity of the statute, Sec. 680 of the Act, above set forth, apportioning to the Authority a part of the motor fuel excise taxes on fuel consumed on the turnpikes, and validity of Section 683, supra, empowering it to pledge the same as security for turnpike bonds to make up any deficiency in moneys available to meet interest and principal requirements on said bonds. Section 680 further provides that should the Authority hereafter sell any additional bonds the monthly apportionments shall not in any fiscal year exceed $3,000,000, provided that if in any

month there shall be a balance in the trust fund created thereby equal to three years' annual interest on bonds on turnpikes hereafter financed there shall be no apportionment in said month.

■ We have heretofore held herein that such statutes were valid when we denied the claims of Protestants that the statutes were unconstitutional. There is no need for further discussion of this proposition. In the cited case of Application of Oklahoma Turnpike Authority, Okl., 365 P.2d 345, 348, we stated:

"Legislative authorization to the Oklahoma Turnpike Authority to grant to holders of turnpike bonds a vested right to the state's continued apportionment to said authority of 97% of excise taxes collected on motor fuel consumed on all state turnpikes subject to the right of the state to raise, lower or repeal said tax, is not unconstitutional.

"Facts examined, and Held: That under the Constitution of the State of Oklahoma, the Enabling Act and other applicable law the holders of the bonds issued and secured under the trust agreement will have an accrued and vested contract right not only in and to an exclusive pledge by the authority under the trust agreement of deposits accumulated in the trust fund but also in and to the continued apportionment to the Authority, each calendar month, until all of the bonded indebtedness including the interest thereon for the Turner Section of the Oklahoma turnpikes is paid in full, of 97% of an amount equal to the motor fuel excise taxes computed on 97½% of the total gallonage of all fuels consumed, during the calendar month during which the tax being apportioned accrued, an all Oklahoma turnpike projects and to the continued deposit in the trust fund of the full amount of each such apportionment; provided that no such pledge or vesting of said contract right shall be deemed to restrict in any way the State's power to change the rate of the motor fuel tax levy or to repeal said levy."

The Authority also presents the question of its power under the Act to refund the outstanding bonds of the Turner Turnpike (1950) in the amount of $24,698,000, the H. E. Bailey Turnpike bonds (1961) in the amount of $56,500,000, and of Section A of the Eastern Turnpike bonds (1963) in the amount of $31,000,000. Bonds of the Turner Turnpike are at this time callable for redemption with a provision for a 3% redemption premium. Bonds of the H. E. Bailey Turnpike and Section A of the Eastern Turnpike are callable for redemption between July 1, 1971, and July 1, 1975, upon payment of a 5% redemption premium, and as to them the application proposes advance refunding.

The Authority relies on the provisions of 69 O.S.1961, Sec. 669, as amended in 1965 (69 O.S.Supp.1965, Sec. 669) as its authority to effect the refunding.

The first paragraph of Sec. 669 provides in pertinent part that the Authority is authorized to issue refunding bonds to refund any bonds then outstanding which had been issued under the Act, and further states:

"* * * The Authority is further authorized to provide for the issuance of its turnpike revenue bonds for the combined purpose of (a) refunding any bonds then outstanding which shall have been issued under the provisions of this Act, including the payment of any redemption premium thereon and any interest accrued, or to accrue to the date of redemption of such bonds, and (b) paying all or any part of the cost of any additional turnpike project or projects as authorized by this Act. * * *

"Bonds may be issued by the Authority under the provisions of this section at any time not more than ten (10) years prior to the maturity or maturities or the date selected for the redemption of the bonds being refunded thereby. Pending the application of the proceeds of such

refunding bonds, with any other available funds, to the payment of the principal, accrued interest, and any redemption premium of the bonds being refunded and, if so provided or permitted in the resolution authorizing the issuance of such refunding bonds or in the trust agreement securing the same, to the payment of any interest on such refunding bonds, and any expenses in connection with such refunding, such proceeds may be invested in direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America which shall mature or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when the proceeds, together with the interest accruing thereon, will be required for the purposes intended, or, in lieu of such investments, all or any part of such proceeds may be placed in interest bearing time deposits or other similar arrangements may be made with regard thereto which will assure that such proceeds, together with the interest accruing thereon, will be available when required for the purposes intended."

That part of the quoted first paragraph providing for bonds for the combined purpose of refunding and to pay for any additional turnpike project or projects, and all of the quoted second paragraph were not in the prior statute and are new and were added by the 1965 amendment.

The Authority has incorporated in its resolution a statement in full compliance with the above amended statute that it will so invest sufficient funds in the described government obligations or those guaranteed by the United States, for use when the bonds of the H. E. Bailey Turnpike and Section A of the Eastern Turnpike are callable for redemption.

At this point we observe that the outstanding bonds of the three named turnpikes were obviously issued prior to the 1965 amendment, but were issued under the statute prior to amendment which limited each refunding issue to the bonds of the project being refunded and limited the revenue pledged to the refunding bonds to that derived from the separate project. In view of this circumstance there may be some belief that the Authority may not rely upon the amended statute. Such belief is unfounded.

The bonds of the three named turnpikes refer to the trust agreement by which they are each secured and recite the bondholder assents to all of the provisions of said agreement. The trust agreements securing the bonds of the H. E. Bailey Turnpike and Section A of the Eastern Turnpike provide in part as follows:

"Section 1201. If, when the bonds secured hereby shall have become due and payable in accordance with their terms or shall have been duly called for redemption or irrevocable instructions to call the bonds for redemption shall have been given by the Authority to the Trustee, the whole amount of the principal and the interest and the premium, if any, so due and payable upon all of the bonds and coupons then outstanding shall be paid or sufficient moneys shall be held by the Trustee or the Paying Agents for such purpose under the provisions of this Agreement, and provision shall also be made for paying all other sums payable hereunder by the Authority, then and in that case the right, title and interest of the Trustee shall thereupon cease, determine and become void, and the Trustee in such case, on demand of the Authority, shall release this Agreement and shall execute such documents to evidence such release as may be reasonably required by the Authority, and shall turn over to the Authority or to such officer, board or body as may then be entitled by law to receive the same any surplus in any account in the Sinking Fund and all balances remaining in any other funds or accounts other than moneys held for the redemption or payment of bonds or coupons; otherwise this Agreement shall be,

continue and remain in full force and effect."

The trust agreements securing the bonds of Turner Turnpike have practically identical provisions with some immaterial variations.

It is our opinion that the alternative provision of giving "irrevocable instructions to call the bonds for redemption" coupled with the provisions for holding sufficient moneys to pay the principal, interest and (redemption) premiums, when considered in connection with the other parts of the quoted Section, can only be interpreted as an agreement or consent to advance refunding of the bonds.

The Authority has or will give irrevocable instructions to call the bonds for redemption and has made provision that sufficient moneys be held for the purpose of paying the principal and the interest and the premium on all of the bonds when they become callable for redemption. These acts are in accord with the understanding expressed in the trust agreements. When the Legislature amended the statute in 1965, in the manner above set forth, it furnished the Authority an enlarged plan for refunding and furnished to the bondholders interim security for the safe and secure payment of the amounts due them when the bonds became redeemable. We fail to see wherein any security or rights have been impaired.

Under the statute prior to amendment, 69 O.S.1961, Sec. 669, the Authority was empowered to refund *any* outstanding bonds issued under the Act. By the amendment, supra, the Legislature recognized the provision, supra, of the then existing trust agreements relative to "irrevocable instructions to call the bonds for redemption" and limited issuance of refunding bonds to a time not more than 10 years prior to maturity or the date selected for the redemption of the bonds being refunded. Such practice is not new. In City of Albuquerque v. Gott, 73 N.M. 439, 389 P.2d 207, the legislature enacted a statute providing for issuance of refunding bonds and required

that the bonds to be refunded either mature or be callable within ten years from the date of issuance of the refunding bonds. It was also provided that pending use of the proceeds, the same could be invested in direct obligations of the United States of America. The court approved the ten year provision as not being unreasonable. The Supreme Court of Florida approved advance refunding of seven weeks in Fleeman v. City of Jacksonville, 140 Fla. 478, 191 So. 840, seven months in State v. City of Miami, 155 Fla. 6, 19 So.2d 410, two or three years in State v. City of Orlando, Fla., 82 So.2d 874, and for five years in State v. City of Melbourne, Fla., 93 So.2d 371.

 It is our opinion that under the circumstances here presented the Authority is empowered to issue turnpike bonds to refund the outstanding bonds of Turner Turnpike, H. E. Bailey Turnpike, and Section A of the Eastern Turnpike.

The Authority presents the question of whether it may lawfully pay to the State Highway Commission the sum of $627,-522.24, for costs and expenses incurred with the approval of the Authority for traffic surveys, preparation of plans and specifications, and other engineering services in connection with turnpike projects now or previously authorized by the Legislature.

The Authority proposes to pay said amount from the balances of moneys (other than moneys held for the payment or redemption of bonds and coupons) held by the trustee in the trust agreements securing the Turner Turnpike, the H. E. Bailey Turnpike, and Section A of the Eastern Turnpike. Under the provisions of Section 1201 (quoted above) of said trust agreements and termination thereof these balances are released and are to be turned over to the Authority. This is the natural result of the refunding.

It is alleged in the application that such costs and expenses fall within the cost per mile limitations set forth in 69 O.S.Supp.

1965, Sec. 654(c), which states in part as follows:

"* * * Any obligation or expense hereafter incurred by the State Highway Commission with the approval of the Authority for traffic surveys, borings, preparation of plans and specifications, and other engineering services in connection with the financing and construction of a project shall be regarded as a part of the cost of such project and shall be reimbursed to the State out of the proceeds of the turnpike revenue bonds hereafter authorized; provided, the State Highway Commission shall not incur obligations or expenses totaling more than One Thousand Five Hundred Dollars ($1,500.00) per turnpike mile. Provided further, however, that an additional sum not to exceed One Thousand Dollars ($1,000.00) per turnpike mile may be expended for updating reports prior to financing."

We have previously upheld the validity of reimbursement to the Highway Commission by use of bond funds in Application of Oklahoma Turnpike Authority, Okl., 386 P. 2d 165, 173, 174.

The above described balances are the result of revenues of the turnpike projects and when they come into the hands of the Authority must necessarily be used by it to defray legitimate expenses incurred within the powers and authority granted to it. Obligations or expenses of the Highway Commission in making traffic surveys, borings, preparation of plans and specifications, and other engineering services in connection with turnpike projects are legitimate expenses of the Authority, supra. The Act provides that all expenses incurred in carrying out the provisions of the Act shall be payable solely from funds provided under the authority thereof, Sec. 655(e); that the Authority is empowered to make and enter into all contracts and agreements necessary or incidental to the performance of its duties, Sec. 655(k), and to do all things necessary or convenient to carry out the powers expressly granted, Sec. 655(n); au-

thorizes the Authority and its authorized agents to enter upon lands, waters and premises for the purpose of making surveys, soundings, drillings, and examinations as it may deem necessary or convenient for the purposes of the Act, Sec. 656. Furthermore, Sec. 672 states the Act is necessary for the welfare of the State and its inhabitants, and "shall be liberally construed to effect the purposes thereof." Clearly the proposed use is for public highway purposes.

It is our opinion that such funds may be used to reimburse the State Highway Commission for its expenses.

The Authority further presents the question of whether it may terminate the trust agreements securing the outstanding bonds of the Turner Turnpike (1950), the H. E. Bailey Turnpike (1961), and of Section A of the Eastern Turnpike (1963).

Our statements and conclusions heretofore made herein largely dispose of this question. Title 69 O.S.Supp.1965, Sec. 669, of the Act, stated and quoted, supra, expressly provides for the issuance of bonds to refund any outstanding turnpike bonds, including any redemption premium and any interest accrued, or to accrue, to the date of redemption of such bonds. The quoted Section 1201 of each of the trust agreements securing the bonds of the three turnpikes being refunded provide that when irrevocable instructions have been given to call the bonds for redemption and sufficient moneys are held by the respective trustees to pay the principal and interest and premium (due on the date callable), the right, title and interest of such trustees shall cease and the trust agreements released and the balances of funds delivered to the Authority.

The Authority has by resolution elected to call the bonds for redemption and has directed the Trustee in the present Trust Agreement, upon issuance of the present bonds, to deposit with the trustee in the trust agreement securing the Turner Turnpike bonds an amount sufficient in the above respects to pay the principal, interest and redemption premium thereof. Like-

wise, the Authority has directed the Trustee in the present Trust Agreement, upon issuance of the present bonds, to purchase upon behalf of the Authority, and deposit with the trustee under the trust agreements securing the H. E. Bailey Turnpike bonds and Section A of the Eastern Turnpike bonds direct obligations of the United States Government or obligations the principal and interest of which are unconditionally guaranteed by the United States Government, in such aggregate principal amounts respectively which at all times will be sufficient, with the interest payable thereon, to pay the interest which will become due and payable on such outstanding bonds on each interest payment date prior to the date fixed for their redemption and on the redemption date, and to redeem said outstanding bonds on the redemption date. The time of issuance of the proposed bonds is less than ten years prior to the date selected for redemption of the bonds being refunded.

The Authority has elected to follow the provisions of Sec. 669 of the Act and deposit with said trustees obligations, either direct or guaranteed by the United States Government, in place of moneys. However, this substitution will leave the bondholders with securities backed by the faith and credit of the United States, which is the foundation of all money values and without which there would be no financial security.

The above statement of facts reflects compliance with the requirements necessary to a termination of the trusts. It is our conclusion that the Authority may thereby terminate such trusts.

■ The Authority presents the question of whether it is empowered by the Turnpike Act to pay the Oklahoma State Highway Department from the proceeds of the bonds not to exceed the sum of $2,454,000 for the estimated cost of constructing a two-lane roadway from Hugo to the Red River and one-quarter of the cost of a 28 foot roadway bridge over the Red River, pursuant to contract with the Highway Department.

These facilities will be toll-free and will be used by Turnpike patrons and may be used by other motorists not Turnpike patrons.

Similar propositions have been presented to this court in other cases concerning the validity of the Authority paying the cost of access roads, lead roads and bridges. See Applications of Oklahoma Turnpike Authority, Okl., 277 P.2d 176, 192, 193, 194; Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510, 518; and Application of Oklahoma Turnpike Authority, Okl., 359 P.2d 680, 691, 692, 693. In the cited cases this proposition was thoroughly discussed and it was held that the Authority was so empowered.

We accordingly hold that the Authority may validly make such payment to the Oklahoma Highway Department.

■ The application of the Authority presents the further question of whether it is lawful for the Authority to use a part of the bond proceeds to build an administration building for use of all turnpikes at a cost of $500,000, with the capital investment therein and the cost of its operation, repair and maintenance allocated and charged periodically upon a fair and equitable basis to the Will Rogers Turnpike, so long as it remained a separate project.

In Application of Oklahoma Turnpike Authority, Okl., 277 P.2d 176, 182, 183, it was held that the use of such funds from the several projects therein named to build an administration building for use of all turnpikes constructed and to be constructed was lawful. This conclusion was based on cited sections of the Act authorizing such construction and the recognized fact that the projects must either own or pay rent for office quarters for use of personnel in administering such projects. It was also based upon the obvious economic fact that it would be a waste of funds to require separate office quarters and complete separate personnel, and that any rent paid by other projects would be income for payment of the bonds furnishing the funds to construct the building.

The contribution the Authority proposes to charge the Will Rogers Turnpike is not denominated "rent." However, it must be recognized that the capital investment involved, and the cost of operation, repair and maintenance of a building are, inter alia, primary factors to be considered in determining the charge (rent) to be collected for use of the building. The fact that the Authority chose to base the charge upon these factors is no more than a choice of a formula to arrive at a fair and equitable amount for the Will Rogers Turnpike to pay.

For the reasons stated we answer this question in the affirmative.

▆▆▆ The Authority presents the further proposition of whether it may validly combine and operate as a single project, designated the Oklahoma Turnpike System, the Turner Turnpike, the H. E. Bailey Turnpike, Section A of the Eastern Turnpike, and the hereafter constructed Section B of the Eastern Turnpike and Muskogee Turnpike.

A similar question was presented in Application of Oklahoma Turnpike Authority, Okl., 359 P.2d 680, 695–697, regarding the combining of the Southwestern (H. E. Bailey) Turnpike Project and Eastern Turnpike Project for financing purposes into one unit and treating them as a single project with a single sinking fund for all the bonds. We there held such combining could be done under the express provisions of Sec. 659 of the Act, which provides in part as follows:

"The Authority is hereby authorized to provide by resolution, at one time or from time to time, for the issuance of turnpike revenue bonds of the Authority for the purpose of paying all or any part of the cost of any one or more turnpike projects, and the Authority may in its discretion, where it finds that it would be economical and beneficial to do so, combine two or more, or any part thereof, or all of its proposed projects into one unit and consider the same as one project to the same extent and with like effect as if the same were a single project."

The Legislature has now enacted that part of 69 O.S.Supp.1965, Sec. 669, supra, providing for issuance of turnpike bonds for the combined purpose of refunding any bonds then outstanding and to pay all or any part of the cost of any additional turnpike projects authorized by the Act. Section 669 also provides:

"* * * The issuance of such bonds, the maturities and other details thereof, the rights of the holders thereof, and the rights, duties, and obligations of the Authority in respect of the same, shall be governed by the provisions of this Act insofar as the same may be applicable."

The present bonds represent the cost of the named turnpikes now in existence and the cost of the projected turnpikes. The combined revenues of all of them have been pledged by the Trust Agreement to secure the payment of the bonds the Authority now seeks to issue. It would be entirely illogical to conclude that the Legislature, after authorizing a single bond issue for refunding and to build new projects, would intend that there be a continued separation thereof in other respects. Such an interpretation would render ineffectual the statutory provision for a single issue of bonds for the combined purpose described therein. It is again pointed out that Sec. 672 of the Act directs that the Act be liberally construed to effect the purposes thereof.

It is our conclusion that the Authority may combine and operate the named turnpikes as a single project.

The Protestants Christian and Mc-Caughey collectively urge in effect that the project outlined and described in the Authority's application as the basis for issuance of the bonds is not feasible and economically sound, and that the Authority's approval thereof was arbitrary, capricious and without foundation in law or fact. Protestant Christian urges additionally that this proceeding be referred to a Referee of this Court for a hearing thereon. It appears these propositions are based in part upon their contentions that certain portions of the Turnpike Act are unconstitutional and unenforceable, and particularly that

portion thereof providing for apportioning of a part of the motor fuel tax to the Authority as revenues of the turnpikes. In all such matters we have held herein against such contentions.

It appears further that such Protestants have some misconceptions relative to the Act and the function of this court in this proceeding.

The purpose of the Act, Sec. 651, inter alia, is to remove the present handicaps and hazards on the congested highways of the State by providing modern express highways, embodying reasonable safety devices, to be constructed, maintained and operated by the Authority as turnpikes, at locations defined by the Legislature and approved by the State Highway Commission, with proceeds of bonds payable solely from revenues. The Legislature created the Authority, Sec. 653, as a body corporate and politic, and constituted it an instrumentality of the State, and the exercise of its powers to be deemed and held to be an essential governmental function of the State with all the attributes thereof.

The Legislature, inter alia, authorized and empowered the Authority, Sec. 655, to construct, maintain and operate these projects at such locations and routes (defined by the Legislature) as the Authority should determine to be feasible and economically sound. The Legislature, in its wisdom, has apportioned to the Authority a part of the motor fuel tax produced on the turnpikes to back-up payment of principal and interest, supra. This "project," as to revenue, will consist of five turnpikes. In determining that Section A of the Eastern Turnpike and the Muskogee Turnpike were feasible and economically sound the Authority relied upon full, complete and comprehensive engineering and traffic reports, and in determining that the proposed bonds were sufficiently secured it must have considered the revenues of the combined turnpikes and most assuredly it took into account the revenues from the apportioned motor fuel tax. The Legislature, speaking through the Act, has declared a policy for financing and con-

structing turnpikes, and has stated, Sec. 672, that the Act shall be liberally construed.

It cannot be doubted that the Authority in approving the issuance of the subject bonds and in combining the turnpikes for operation as a single unit must have considered the elimination of many duplicate operations now being carried on by the Authority for the separate turnpikes and the consequent reduction in expense that would be accomplished by a single operation. In particular we refer to the savings that would accrue by pooling the machinery and equipment necessarily required in the maintenance and repair of the turnpikes so that it could be used in such operations upon any of the turnpikes comprising the Oklahoma Turnpike System. Likewise there would no doubt be considerable savings in accounting, clerical help and various other services.

Under these circumstances we believe that the duties and functions of this court are well defined.

As to the constitutionality of certain portions of the Act, and as to the propriety, wisdom and practicability of the overall legislative plan expressed in the Act, including the discretion vested in the Authority, the applicable rule of law is stated in the decision involving the financing and construction of the capitol office buildings, Application of Oklahoma Capitol Improvement Authority, Okl., 355 P.2d 1028, 1031, as follows:

"In construing the constitutionality of a statute, the Supreme Court is not authorized to consider its propriety, desirability, wisdom or its practicability as a working proposition. Those questions are clearly and definitely established by our fundamental law to a certainty as functions of the legislative department of government. The function of the court is clearly limited to the determination of the validity or invalidity of the act. There is a presumption that the Act is constitutional. The Legislature, unless prohibited by the Constitution, has the right to declare fiscal policy. and the question as to the wisdom of the policy is

not within the scope of authority of the Supreme Court. Courts must sustain statutes, if possible, and nullify them only when they are clearly unconstitutional."

We adopt the statement in our decision involving legislative authority for the issuance of bonds to finance and construct a power and heating plant on the campus of the University of Oklahoma, Application of Board of Regents of University of Oklahoma, 200 Okl. 442, 195 P.2d 936, 941:

"We here mean no condemnation or even criticism of this plan. We only desire to make it plain that we confine this opinion to the proper judicial function of approving that which is clothed with proper and required legal form, is based upon lawful purpose, projected on a plan legally provided for, which bears no mark or sign of invalidity, and when all questions as to validity are resolved to the satisfaction of this court."

The contentions of the Protestants in the above respects are denied.

██. Having fully heard and considered this matter, the court finds that as to the Bonds here involved, the Authority proceeded within its legal authority and in conformity with applicable law, that the several protests and questions presented are hereby answered and determined as above set out, and that said Bonds when issued in accordance with applicable statutory law and this decision will constitute valid obligations in accordance with their terms. The court hereby approves the bond issue here presented.

The court hereby fixes a period of 5 days within which a petition for rehearing may be filed herein.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, J., concur.

BLACKBIRD and HODGES, JJ., concur by reason of stare decisis.

WILLIAMS and BERRY, JJ., concur specially.

IRWIN and LAVENDER, JJ., dissent.

WILLIAMS, Justice (concurring specially).

"Advance refunding" has already been approved in Oklahoma. This Court in the very recent case of Application of the Board of Regents of University of Oklahoma, etc., 37 O.B.J. 1342, upheld as applied to the University's Board the principle of advance refunding both with respect to advance refunding of bonds on self-liquidating projects and such refunding in combination with construction of new buildings to become part of a system of student housing and dining facilities.

It is contemplated by our Constitution, Article X, Section 15, that the credit of the State shall not be loaned. The State owns the beneficial interest in our turnpikes, old and new. Else, what business would it be of the Legislature to enact concerning them? When paid out, if ever, the respective turnpikes will become a part of our free highway system. In this case, there is involved no lending of the State's credit to anyone.

Most of the other questions raised in the case have been answered in our former opinions to which reference has been made in the majority and individual opinions this date promulgated herein.

I believe the State has the authority to pledge its equity in existing turnpikes to help better finance both other existing ones and those yet to be constructed, because such equity was not obtained by the expenditure of tax money. See Application of Oklahoma Planning and Resources Board, Okl., 274 P.2d 61; and Application of Board of Regents of University of Oklahoma, supra. And for analogy see language quoted from Application of Board of Regents for Oklahoma Agricultural and Mechanical Colleges, 196 Okl. 622, 167 P.2d 883 as quoted in Application of Oklahoma Turnpike Authority, Okl., 365 P.2d 345, 353.

The integrity of bonds being refunded is not involved. When funds are received and placed in trust and in turn invested in U. S.

Government bonds to await the day the bonds to be refunded may become callable and are called, the rights of holders of the old bonds are fully protected and they may properly be heard to say no more. See City of Albuquerque v. Gott, 73 N.M. 439, 389 P.2d 207, referred to in majority opinion herein and in our opinion in Application of the Board of Regents of University of Oklahoma, supra.

I concur specially.

I am authorized to announce the concurrence of HODGES, J., in the views herein expressed.

BERRY, Justice (concurring specially by reason of stare decisis).

For reasons herein set forth I am concurring in the majority opinion.

In my mind the troublesome issues are: (1) the vested pledge of the apportionment of the gasoline tax to the bondholders; (2) the continued and additional burdening as security for the bondholders of the State's remainder interest in the Turnpikes of this State. These matters were issues in our former holdings and have heretofore been determined, and even though I was not convinced of their soundness prior to their final adjudication, these decisions are the present law of this State.

In 21 C.J.S. Courts § 187, at page 304, we find this language:

"In determining a case the court is not concerned with what the law ought to be, but its sole function is to declare what the law, applicable to the facts of the case, is."

The protestants' briefs, as to the two stated issues, concede these points have been determined and adjudicated by this Court, but urge us to now overrule our former holdings. I am aware of the power of this Court to change the law in order to prohibit the perpetuation of error and grievous wrong.

21 C.J.S. Courts § 193, at page 324, reads:

"An established rule or principle will not be departed from, however, except in case of grave necessity, when cogent reasons or consideration of justice or public interests, relative to plain principles of the law, require such departure, and on the fullest conviction that the law has been settled wrongly, and that less injury will result from overruling than from following the earlier decisions. * * *"

A strong and convincing argument can be made both to overrule our former decisions and on the other hand to sustain them. I have tried to consider carefully both contentions. I have not been convinced that justice and public interest will best be served in the overruling of our former decisions. In my deliberations I have been cognizant that this proceeding and project was the will of the Legislature of this State, and any doubt as to the legality of these statutes under consideration would be resolved in favor of the legislative act. I feel in the present case bound by the rule of stare decisis.

I disagree with that portion of the majority which states, in reference to the inclusion of the Will Rogers bonds in the refunding program, that

"We believe that the proposition of whether it was, or was not, practical to include such bonds in the refunding would be largely and probably entirely within the discretion of the Authority."

This statement is dicta, but even so could be misconstrued resulting in unforeseen and uncertain consequences.

In my opinion if the Turnpike Authority would exercise its discretion as requested by one of the protestants, and extend further security or benefits to the bondholders beyond the contractual obligations or without additional consideration from the Will Rogers bondholders they would be in violation of Art. X, § 15 of the Constitution of Oklahoma, which reads in part:

"The credit of the State shall not be given, pledged, or loaned to any individual * * *; nor shall the State * * * make donation by gift * * or otherwise * * *."

Any attempt to give or extend credit beyond contractual obligations or without additional consideration from the bondholders, with or without legislative authority, would be violative of this Section of the Constitution.

IRWIN, Justice (dissenting).

One of the primary issues herein presented, and one of first impression, is the constitutionality of that portion of the 1965 legislative enactment (Title 69 O.S.1965 Supp. Sec. 669), which authorizes the Authority to issue turnpike revenue bonds for the combined purpose of refunding any outstanding turnpike bonds and paying all or any part of the cost of any additional turnpike projects.

In my opinion, one of the fundamental questions which would have to be determined first is whether or not the State of Oklahoma, as distinguished from the Authority, has any right, title and interest in the projects to be refunded.

If the State of Oklahoma has any right, title and interest in the projects I am of the opinion that that portion of Sec. 669, supra, above mentioned, contravenes Article X, Sec. 15, of the Oklahoma Constitution, which provides:

"The credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality or political subdivision of the State; nor shall the State * * make donation by gift, * * * or otherwise, to any company, association, or corporation."

In my judgment, the State does have some right, title and interest in the bonds to be refunded for the following reasons.

Although the Turner, Bailey and Eastern "A" Turnpikes are sought to be refunded, I will confine my views to the Turner Turnpike. Turner is a highly successful turnpike project and has reduced its bonded indebtedness from $38,000,000 to $24,698,-000, or approximately 35%. Under the legislative enactment under consideration, if the Legislature can constitutionally authorize the Authority to refund Turner in the present proceeding, it could constitutionally authorize the Authority to refund Turner if there remained outstanding only 1, 5 or 10% of its original bonded indebtedness. In other words, if there remained outstanding only $1,000,000 of Turner bonds, and the above enactment is constitutional, the Authority could refund Turner and combine it with any additional turnpike proposed to be constructed. At the present time, Turner is burdened with a $24,698,000 bonded indebtedness and when the bonds are issued herein, the same will be burdened with a $190,000,000 bonded indebtedness.

Turner and each of the present existing turnpikes and their bonds are the result of separate projects of the Authority, with their own individual rate of interest, principal amounts, maturity dates, redemption privileges and security. When all of the existing bonds were issued they were issued under Title 69 O.S.1961, Sec. 669, which provided that "Each refunding issue shall be limited to the project in connection with which the bonds being refunded were issued and revenues pledged to pay any such refunding issue shall be limited to the revenue derived from said separate project." The 1965 Legislature amended Sec. 669, supra, and by such amendment the Authority was authorized to provide for the issuance of its turnpike revenue bonds for the combined purpose of refunding any bonds then outstanding and paying all or any part of the cost of any additional turnpike projects. It is this amendment which removes the restriction of limiting refunding bonds to the project for which the bonds were issued that in my opinion is unconstitutional.

Not only were the bonds of Turner and all present existing turnpikes issued with the limitation on refunding as prescribed by Sec. 669, supra, but such bonds were also issued under Title 69 O.S.1961, Sec. 667, which, inter alia, provides:

"When all bonds issued under the provisions of this Act and the interest thereon

shall have been paid or a sufficient amount for the payment of all such bonds and the interest thereon to maturity thereof shall have been set aside in trust for the benefit of the bondholders, such projects, if then in good condition and repair to the satisfaction of the State Highway Commission, shall become part of the State Highway System and shall thereafter be maintained by the State Highway Commission free of tolls. * * *."

Section 667, supra, contains a further proviso to the effect that when all the bonds for any turnpike project and interest thereon shall have been paid in full, such project shall continue to be operated as a toll facility until all bonds issued by the Authority and the interest thereon shall have been paid or such provisions for payment made. The constitutionality of a similar proviso was upheld in Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510.

In my opinion, there is a clear-cut distinction between pledging the tolls of a paid out turnpike project, and refunding an existing turnpike project and combining it with a project to be constructed. Apparently the Legislature recognized this distinction for it authorized the pledging of tolls of paid out projects in 1955 and did not authorize the refunding of an existing turnpike project and combining it with other projects until 1965.

In my judgment, when bonds for a turnpike project have been issued under a statutory provision that such project shall become a part of the State Highway System when such bonds and interest thereon are paid in full, the State of Oklahoma has some right, title and interest in such project prior to the time the bonds and interest thereon are paid in full. Having such right, title and interest, the Legislature could not authorize the hypothecation thereof.

In my opinion, Application of Oklahoma Planning and Resources Board, Okl., 274 P. 2d 61, is not applicable. When the bonds were originally issued there, they were issued under Title 74 O.S.1961, Sec. 356.16, which provided "The Board may issue bonds hereunder for the purpose of refunding any obligations of the Board theretofore issued hereunder, or may authorize and deliver a single issue of bonds hereunder in part for the purpose of refunding such obligations and in part for the acquisition of additional properties or improvements * * *." The instant bonds to be refunded were issued under a statutory provision that "Each refunding issue shall be limited to the project in connection with which the bonds being refunded were issued and revenues pledged to pay any such refunding issue shall be limited to the revenue derived from said separate project." They were also issued with the proviso that they shall become a part of the State Highway System when the bonds had been paid.

For the foregoing reasons, I am of the opinion that that portion of Title 69 O.S. 1965 Supp. Sec. 669, which authorizes the Authority to issue turnpike revenue bonds for the combined purpose of refunding any outstanding turnpike bonds and paying all or any part of the cost of any additional turnpikes is unconstitutional.

Assuming however, the above legislative enactment is constitutional with reference to the issues above discussed, I would still be of the opinion that we could not approve the constitutionality of the enactment.

In my judgment, the Legislature has delegated to the Authority legislative powers by authorizing the Authority to issue revenue bonds for the combined purpose of refunding any outstanding bonds and paying all or any part of the cost of any additional projects without any guide lines or standards upon which to exercise such authority. In my opinion, the Legislature has reposed in the Authority an absolute, unregulated and unbridled authority to exercise its discretion without guide lines or standards.

A legislative enactment which in effect reposes an absolute, unregulated and undefined discretion in an administrative body bestows arbitrary powers and is an unlawful delegation of legislative powers in viola-

tion of the Constitution. See Seltzer v. Commissioners of Land Office, Okl., 258 P.2d 1172.

In my opinion, this proceeding is controlled by the above case.

This Court has previously sustained the constitutionality of the apportionment of the motor fuel tax and the continuation of tolls an all turnpike projects until all the principal and interest on all turnpikes have been paid. My views on the constitutionality of these matters were set forth in my dissenting opinion in Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510.

For the foregoing reasons, I respectfully dissent to the views promulgated by a majority of my associates.

LAVENDER, Justice (dissenting).

I am unable to concur in the majority opinion and respectfully dissent thereto for the following reasons:

I believe the pledging of motor fuel tax revenues to be received in the future violates Art. X, Sec. 23 of our Oklahoma Constitution, and I believe this Court should overrule Application of Turnpike Bonds, Okl., 365 P.2d 345, which opinion in effect approves as valid the 1961 statutory classification of a part of motor fuel revenues to be received by the State of Oklahoma as "revenues of the Oklahoma Turnpikes." While I realize that the only constitutional justification for permitting the pledge of future gasoline taxes is to categorize them as revenues from the turnpikes, I simply am unable to agree that such taxes would be any more the revenues from the turnpikes than state sales taxes collected at the University of Oklahoma Student Union would be revenues of that institution. I am also of the opinion that the 1965 Act, insofar as the same authorizes the use of gasoline taxes accrued to the Trust Fund, prior to the effective date of such Act, to make up deficiencies in payments on the principal of the bonds is violative of that part of Art. X, Sec. 19 of our Oklahoma Constitution which provides

"* * * no tax levied and collected for one purpose shall ever be devoted to another purpose, * * *." The only purpose for which such collections could be used prior to the effective date of the 1965 Act was to make up deficiencies in payment of interest on the indebtedness and to now authorize such funds for the additional use is, to my mind, contrary to the last cited constitutional provision. Compare 69 O.S.1961 Sec. 683(b), as amended in 1965, with 69 O.S.1961 Sec. 683 and Sec. 4(b) of Chapter 18c, Oklahoma Session Laws 1959, page 287.

I would, if I were writing the majority opinion, make the above holding concerning the future pledging of motor fuel revenues to be unconstitutional, prospective in effect so as to not affect in any way the integrity or validity of bonds previously approved by this court.

For these reasons I respectfully dissent.