Max A. LADT, a citizen, resident and taxpayer of the County of McCracken, Kentucky, Individually and as a representative of all citizens, residents and taxpayers of said County, Appellant,

v.

COUNTY OF McCRACKEN, Kentucky and Lourdes Hospital, Inc., Appellees.

Court of Appeals of Kentucky.

July 22, 1977.

W. David King and Burton A. Washburn, III, King & Washburn, Paducah, for appellant.

Samuel Carlick, Paducah, Jo M. Ferguson, Harper, Ferguson & Davis, Louisville, W. Pelham McMurry, McMurry & Livingston, Paducah, for appellees.

Before MARTIN, C. J., PARK and GANT, JJ.

MARTIN, Chief Judge.

The County of McCracken has agreed to help the Lourdes Hospital in Paducah expand its facilities and refund original construction bonds by issuing revenue bonds under Chapter 103, as amended, Kentucky Revised Statutes. The circuit court in a declaratory action brought by a taxpayer upheld the procedure. We affirm.

The issue on appeal is the validity of refunding public project revenue bonds issued under Chapter 58, KRS 58.010–58.440, by using revenue bonds issued under Chapter 103, KRS 103.200–103.260 (as amended, 1976 Supp.).

In 1969 the Fiscal Court of McCracken County took preliminary steps to prepare for the construction of a new hospital in Paducah. The resolution authorizing the project was adopted on June 24, 1969, and acknowledged that the County had some responsibility "for providing, or for assisting in the provision of, medical facilities for its population." The resolution concluded that the Fiscal Court could best achieve this goal by leasing hospital facilities to a nonprofit corporation. The charitable, nonprofit corporation chosen was Lourdes Hospital, Inc.

The construction of the hospital was financed by the County issuing $7,500,000 "County of McCracken Hospital Revenue Bonds—Series of 1970." These bonds were issued under the provisions of KRS 58.010 through 58.150. The bonds and interest were payable solely from the proceeds of a lease to Lourdes Hospital which pledged operating revenues of the hospital to retire the bonds. The County did not undertake to make any payments from its own funds, directly or indirectly. The bonds were sold at a time when interest rates were relatively high. The term bonds, which constituted the bulk of the bond issue, bore an interest rate of 8¼%.

The operation of the hospital since the completion of construction has been very successful, both financially and medically. The need for its services has been so great that an expansion of the number of beds and of its supporting facilities has been deemed necessary. It is estimated the cost of this expansion will be close to two million dollars. In addition to the need for more space, there has been at least one major problem in the operation of the hospital. This problem is the covenant in Section 703 of the 1970 Lease whereby the hospital agreed to maintain medical malpractice insurance covering the activities of all physicians and other employees working within the hospital. This covenant has turned out to be financially oppressive in the light of present costs of malpractice insurance. Therefore, when hospital authorities sought expert advice on the financing of the facilities, they were advised by investment bankers to obtain their new money in a "package" with a refunding of the old bonds. The investment bankers advised that the refunding of the old bonds would result in a saving to the hospital, while at the same time permit the negotiation of a new and more realistic lease agreement.

The method of refunding recommended was the so-called "full-defeasance" method. The entire amount of money required to pay principal and interest on the 1970 bond issue, together with the call premium, would be placed with the Trustee for those bonds. This action would conform to Section 9 of the 1970 Bond Resolution which provides:

That bonds which have been duly called for redemption as provided in Sections 7 and 8 hereof, or with respect to which

irrevocable instructions to call for redemption at the earliest redemption date have been given to the Trustee in form satisfactory to it, and for the payment of the redemption price of which moneys shall be held in a separate account by the Trustee in trust for the holders of the Bonds to be redeemed, shall not thereafter be deemed to be outstanding under the provisions of this Resolution.

Thus it was proposed by bond advisers to the County that all restrictions contained in the 1970 Resolution be eliminated by the "filling-up" of the 1970 Sinking Fund so that the 1970 bondholders would have no further claims against the County or against Lourdes Hospital. To fully fund the 1970 Sinking Fund the County would have to issue a greater principal amount of revenue bonds than the principal amount presently outstanding, as future interest payments must be funded in advance. Proceeds from that portion of the 1977 bond issue designed to refund the old bonds would be delivered to the trustee to be held in trust for the 1970 bondholders. However, inasmuch as this money would not yet be due to the 1970 bondholders under the terms of their contract, it could be invested in obligations of the government or guaranteed by the government for the period prior to the due date of the bonds and interest coupons. The interest from these invested sums would, in effect, be sufficient to pay off the excessive principal amount of the new bonds to be issued. The other part of the new bonds issued for refunding would rely on the income from the hospital, now relieved from its obligation to the old bondholders, and projected increased hospital revenues would support the new bonds issued for expansion.

■ The provisions of Chapter 103, KRS 103.200, Revenue Bonds for Miscellaneous City or County Projects; Industrial Buildings for Cities and Counties, were not available when Lourdes Hospital was originally constructed. The only bonding vehicle available to the hospital in 1970 was provided by Chapter 58. However, in 1972, the legislature amended the Industrial Buildings for Cities and Counties Act, Chapter 292, Acts of 1972, to include within its provisions hospitals and health care facilities. The theory of the legislature, as stated in the preamble to the Act, was that hospitals do constitute an industry giving employment to numerous people, and that consequently the establishment or the expansion of a hospital would tend to promote employment just as the location of a new industry would promote employment. The original statute had been upheld in *Faulconer v. City of Danville*, 313 Ky. 468, 232 S.W.2d 80 (1950). On the basis of the testimony given in the present case it is apparent that the new hospital facilities would immediately require the employment of 20 to 25 additional people. No attempt was made to submit testimony as to indirect effects, but it is readily apparent that the hospital has been and is a major employer in the community. Appellant has made no real attack on this aspect of the case other than to contend that employment has been so bad in McCracken County that this proposal would be inadequate to accomplish the purposes of the Act. Because the proposed project will produce employment, the purposes of Chapter 103 are accomplished to the extent of the new employment. The court below, in paragraph 3 of its Conclusions of Law, found that the proposed facilities will constitute "an industrial building" as that term is defined by KRS 103.200, as amended. This conclusion supports the authority of the County to issue bonds under this statute.

■ Both Chapter 58 and Chapter 103 contain provisions for the refunding of prior issues of bonds. It is conceded that the refunding language in both statutes is stated in terms of bonds already outstanding under that particular statute. In Kentucky, however, it would not have been necessary to specifically provide for refunding in the statute at all. Kentucky is one of the states which has very clearly recognized for many years that any statute conferring the authority to issue bonds contains, by implication, the authority to refund bonds. *Cook v. City of Louisville*, 260

Ky. 474, 86 S.W.2d 157 (1935); *State Highway Commission of Kentucky v. King*, 259 Ky. 414, 82 S.W.2d 443 (1935). This authority exists even in the case of voted or general obligation bonds. *Jones v. Fiscal Court of Fulton County*, 275 Ky. 619, 122 S.W.2d 510 (1938). In many of the older cases, the court speaks of "substitution" of the new refunding bond for the old bond. If there is a true substitution, which was often the case fifty years ago, the bonds themselves contain the language to the effect that the new bonds must be issued on the same terms, except for interest rates, as the old bonds. This makes no sense in the case of revenue refunding bonds which are sold to an entirely new set of bondholders who were not privy to the original contract. If the issuer can make a better arrangement for itself in something more than the rate of interest, why should it not do so? This is nothing more than the "good business practice" which is a controlling factor in the issuance of revenue bonds, as distinguished from general obligation bonds. *Hemlepp v. Aronberg*, Ky., 369 S.W.2d 121 (1963).

 If a refunding can be undertaken in Kentucky without specific statutory authority, there can be no reason why Chapter 58 bonds cannot be refunded as a part of a Chapter 103 project. This is especially true where there is no essential difference between the relationship of the issuer and the lessee in the two cases, and no essential difference in the actual security backing up the bonds. Both bond issues are dependent wholly upon the revenues which constitute the rent payable under the lease agreement. Chapter 103 is designed to accommodate the type of bond issue which is based upon a lease agreement between the issuer and the lessee, a private corporation. Lourdes Hospital is a private corporation, even though it is not a for-profit corporation and is specifically covered as an eligible party under KRS 103.200. It has special privileges under federal tax laws, because it is a charitable corporation, but it is nonetheless "private" in its relationship with the issuer of these bonds in the same manner as an industry seeking the advantages of financing a new factory.

As stated in *City of Bowling Green v. Board of Education of Bowling Green*, Ky., 443 S.W.2d 243 (1969), at page 246:

There are other examples wherein public bodies have a free choice of proceeding under one set of financing statutes or another. For example, a city may finance a water system either under the provisions of KRS 58.010 et seq., or under the provisions of KRS 96.350 et seq. Similarly, a city may finance a sewer system under KRS 58.010 et seq. or under KRS 94.160, and there is a free choice between them.

The Court is aware that *Haney v. City of Somerset*, Ky., 530 S.W.2d 377 (1976), denied the use of Chapter 103 in a bond issue for the purpose of constructing a gas transmission pipeline. However, that case was decided on the specific issue of how the bonds were to be sold and did not reach the issue of whether the project could be financed with industrial revenue bonds. In the present case the statutes, KRS 103.200–260, have been followed and the County of McCracken may issue the proposed bonds. The other issues raised by appellant are without merit. *Hemlepp v. Aronberg, supra*.

The judgment of the circuit court is affirmed.

All concur.