No. 61,704

Kansas Turnpike Authority; Morgan Guaranty Trust Company of New York; Bank IV Wichita, National Association (formerly The Fourth National Bank and Trust Company, Wichita); Bank IV Topeka, National Association (formerly The First National Bank of Topeka); and The First National Bank of Chicago, *Appellees*, v. Henry P. Wheeler and Barr Brothers & Co., Inc., *Appellants.*

(760 P.2d 1213)

Opinion filed August 24, 1988.

*Robert J. Campbell*, of Brown, Koralchik & Fingersh, of Overland Park, argued the cause, and *Leland H. Corley*, of the same firm, and *Leonard S. Shifflett, Carrie A. Durkin*, and *Louis Michael Bell*, of Wilson & McIlvaine, of Chicago, Illinois, were with him on the briefs for appellants.

*Dan Biles*, of Gates & Clyde, Chartered, of Overland Park, argued the cause, and *Lawrence C. Gates* and *Stephen D. Minnis*, of the same firm, were with him on the brief for appellee Kansas Turnpike Authority.

*Robert C. Foulston*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause and was on the brief for appellees Bank IV Wichita and Bank IV Topeka.

*John R. D'Angelo*, of Davis Polk & Wardwell, of New York, New York, argued the cause, and *Deanne Watts Hay*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, was on the brief for appellee Morgan Guaranty Trust Company of New York.

The opinion of the court was delivered by

Allegrucci, J.: This is a declaratory judgment action filed by the plaintiffs against Henry P. Wheeler and Barr Brothers & Co., Inc., defendants/appellants. Plaintiffs seek a declaratory judgment that the 1954 bonds issued by the Kansas Turnpike Au-

thority (KTA) were properly defeased by the 1984 refinancing, and that plaintiffs banks properly discharged their fiduciary duties in permitting the defeasance. The district court granted summary judgment to the plaintiffs and the defendants perfected this appeal.

In 1954, the KTA issued $160,000,000.00 in turnpike revenue bonds to finance the construction of the Kansas Turnpike. The bonds were issued pursuant to a Trust Agreement adopted on October 1, 1954. The bonds have a stated maturity date of October 1, 1994. Under the Trust Agreement, the 1954 bondholders are given a first lien on the tolls and other revenues of the turnpike as security for the payment of interest and principal on the bonds. As long as the Trust Agreement is in effect, the turnpike revenues could not be pledged as security to another bond issue. The Trust Agreement designates Morgan Guaranty Trust Company of New York (Morgan) as trustee and the Fourth National Bank of Wichita (now Bank IV Wichita) as co-trustee. The Trust Agreement also designates as paying agents Bank IV Wichita, the First National Bank of Topeka (now Bank IV Topeka), and the First National Bank of Chicago. The interpretation of this Trust Agreement is the focus of the present action.

In 1984, approximately $36.6 million of the 1954 bonds remained outstanding. In order to finance a construction and improvement program for the Kansas Turnpike and the 18th Street Expressway in Kansas City, Kansas, and to release the first lien of the 1954 bondholders on the turnpike revenues, the KTA issued $134.7 million in new special obligation bonds. From the funds raised by the 1984 financing, $49,211,700.00 was used to purchase U.S. obligations which were then placed into an escrow account. The amount of the U.S. obligations placed into escrow by the KTA under the 1984 refinancing was determined to be sufficient to pay the principal and all interest on the 1954 bonds which remained outstanding in 1984. The KTA obtained a private opinion letter from the Internal Revenue Service determining that the refunding did not violate federal arbitrage laws. Under the refunding plan, KTA issued irrevocable instructions to Morgan to call the 1954 bonds on a series of six specified dates:

| | |
|---|---|
| October 1, 1989 | $1,213,000.00 |
| October 1, 1990 | $6,664,000.00 |

| | |
|---|---|
| October 1, 1991 | $6,889,000.00 |
| October 1, 1992 | $7,121,000.00 |
| October 1, 1993 | $7,362,000.00 |
| April 1, 1994 | $7,415,000.00 |

On February 14, 1986, Barr Brothers & Co., Inc., a Delaware corporation and municipal bond dealer, and Henry P. Wheeler filed a complaint in the circuit court of Cook County, Illinois. Barr Brothers and Wheeler are holders of bonds issued under the 1954 Trust Agreement. Barr Brothers and Wheeler brought the Illinois action individually and as a class action on behalf of all similarly situated bondholders, naming as defendants KTA, Morgan, Bank IV Wichita, Bank IV Topeka, and First National Bank of Chicago. The complaint alleged that the 1984 defeasance of the 1954 bonds was improper and a violation of the 1954 Trust Agreement. On April 10, 1986, the defendants in the Illinois action commenced this action for declaratory judgment in Shawnee County District Court.

On September 18, 1986, the Illinois action was dismissed by the Cook County circuit court. The court stated that "Kansas is the proper jurisdiction to hear and determine all the issues herein."

The circuit court's decision was affirmed on appeal by the Illinois Court of Appeals on June 11, 1987. *Wheeler v. Kansas Turnpike Authority*, 157 Ill. App. 3d 56, 510 N.E.2d 62 (1987). After discussing the rules relating to the doctrine of *forum non conveniens*, the Illinois appellate court found that the "most important" factor in its decision was "the public interest factor of having localized controversies decided at home." 157 Ill. App. 3d at 58 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09, 91 L. Ed. 1055, 67 S. Ct. 839 [1947]). The court stated:

"As we noted at the outset, the plaintiff's choice of forum will be disturbed only if the balance of factors strongly favors the defendant. After weighing the interests of the defendants discussed above, specifically, the difficulty in access to sources of proof, the cost of obtaining witnesses, the local interest of Kansas in having this dispute decided at home and the public interest factor as to the relative congestion of the courts, we believe that the balance of factors does in this case strongly favor the defendants. Moreover, after considering the public and private interests involved, it is evident that as related to the whole of the transaction between the parties, Illinois' connection is minimal as compared to the interests of Kansas. Therefore, this action more properly belongs in Kansas." 157 Ill. App. 3d at 60.

On April 22, 1987, the Shawnee County District Court denied

the motion of defendants Barr Brothers and Wheeler for summary judgment on the grounds that Kansas lacked personal jurisdiction over them. Thereafter, both the plaintiffs and the defendants filed motions for summary judgment regarding the propriety of the 1984 refinancing plan. A pretrial conference was held on June 19, 1987. On June 26, the defendants filed a motion for leave to file counterclaims, alleging breach of contract, breach of statutory contract, breach of fiduciary duty, securities violations, and common-law fraud. On August 4, 1987, the district court granted summary judgment on behalf of plaintiffs KTA, Morgan, Bank IV Wichita, Bank IV Topeka, and First National Bank of Chicago. Defendants appeal.

The defendants first contend that the 1984 defeasance of the outstanding 1954 bonds violates the terms of the 1954 Trust Agreement. They contend that the Trust Agreement does not permit the KTA to defease the outstanding 1954 bonds by issuing irrevocable instructions to call the bonds in a designated series of installments. Instead, the defendants contend that the Trust Agreement permits defeasance of the outstanding bonds only by the simultaneous redemption of all outstanding bonds at once and "at the earliest redemption date."

Defeasance of outstanding bonds under the 1954 Trust Agreement is controlled by § 1201 of the Agreement:

"If, when the bonds secured hereby shall have become due and payable in accordance with their terms or shall have been duly called for redemption or irrevocable instructions to call the bonds for redemption shall have been given by the Authority to the Trustee, the whole amount of the principal and the interest and the premium, if any, so due and payable upon all of the bonds and coupons then outstanding shall be paid or sufficient moneys shall be held by the Trustee or the Paying Agents for such purpose under the provisions of this Agreement, and provisions shall also be made for paying all other sums payable hereunder by the Authority, then and in that case the right, title and interest of the Trustee and of the Co-Trustee shall thereupon cease, determine and become void, and the Trustee and the Co-Trustee in such case, on demand of the Authority, shall release this Agreement and shall execute such documents to evidence such release as may be reasonably required by the Authority, and shall turn over to the Authority or to such officer, board or body as may then be entitled by law to receive the same any surplus in any account in the Sinking Fund and all balances remaining in any other funds or accounts other than moneys held for the redemption or payment of bonds or coupons; otherwise this Agreement shall be, continue and remain in full force and effect."

Section 1201 essentially provides two mechanisms by which the KTA could obtain the defeasance of outstanding 1954 series

bonds. The KTA might defease the 1954 bonds by paying "the whole amount of the principal and the interest and the premium, if any, so due and payable upon all of the bonds and coupons then outstanding." The second method of defeasance is for the KTA to require that "sufficient moneys" be held by the trustee or paying agents "for such purpose under the provisions of this Agreement, and provisions shall also be made for paying all other sums payable hereunder." In the 1984 refunding, the KTA decided to adopt the second alternative. Section 1201 also designates three circumstances under which defeasance may occur:

(1) At maturity of the bonds on October 1, 1994, "when the bonds secured hereby shall have become due and payable in accordance with their terms";

(2) when the bonds "shall have been duly called for redemption"; or

(3) when the KTA has given "irrevocable instructions to call the bonds for redemption."

The plaintiffs in the present action appear to have complied with the terms of § 1201 by issuing irrevocable instructions to Morgan to call the bonds for redemption. There is no suggestion that the U.S. obligations placed into escrow are insufficient to pay the whole amount of the principal and interest due on the outstanding 1954 bonds. The propriety of the 1984 refunding also receives some support from the Kansas statutes which created the KTA and define its financing powers. The ability of the KTA to refund prior obligations by establishing trusts for payment of the outstanding obligations is reflected in L. 1953, ch. 308, § 17 (now codified at K.S.A. 68-2017). Section 17 provides that any turnpike project "if then in good condition and repair, shall become a part of the state highway system" when all of the principal and interest on bonds issued to finance the turnpike "shall have been paid *or a sufficient amount for the payment of all such bonds and the interest thereon to the maturity thereof shall have been set aside in trust* for the benefit of the bondholders." (Emphasis added.) The Trust Agreement recognizes the importance of Kansas statutory law in interpreting the Agreement. Section 1306 of the Trust Agreement provides in part: "This Agreement is executed with the intent that the laws of the State of Kansas shall govern its construction." Section 1306 also provides: "All covenants, stipulations, obligations and

agreements of the Authority contained in this Agreement shall be deemed to be covenants, stipulations, obligations and agreements of the Authority to the full extent authorized by the Enabling Act and permitted by the Constitution of the State of Kansas."

In determining that the 1984 refinancing of the existing turnpike revenue bonds was proper, the district court found persuasive the reasoning of the Oklahoma Supreme Court in *Application of Oklahoma Turnpike Authority*, 416 P.2d 860 (Okla. 1966):

"The result reached here is entirely consonant with a virtually identical case decided by the Supreme Court of Oklahoma in 1966. [Citation omitted.] In fact, the only distinction even pointed to by defendants is that the record in the Oklahoma case apparently reflects that the refunded bonds were paid at the earliest date possible after the lien was released, the escrow established, and the bonds called. This is a distinction without a difference, however. Clearly, this is an option which KTA could have chosen under the Trust in the case at bar. It, however, made a different choice—a choice this Court has found not prohibited by either the Trust or ruling authority. The Oklahoma court did not *require* immediate redemption of called and refunded bonds. That is just the way it happened to have been done in that case."

In *Oklahoma Turnpike*, the Oklahoma Turnpike Authority sought to refund three series of outstanding turnpike bonds. Two of the bond series, the 1961 series and the 1963 series, were issued under trust agreements which contained provisions identical to § 1201 of the 1954 Kansas Trust Agreement. 416 P.2d at 874-75. The other set of bonds, a 1950 series, was issued under a trust agreement which had "practically identical provisions with some immaterial variations." 416 P.2d at 875.

The Oklahoma Supreme Court held that the provisions in the trust agreements of all three bond series permitted the turnpike authority to refund the bonds by issuing irrevocable instructions to call the bonds at future dates. The court stated:

"The quoted Section 1201 of each of the trust agreements securing the bonds of the three turnpikes being refunded provide that when irrevocable instructions have been given to call the bonds for redemption and sufficient moneys are held by the respective trustees to pay the principal and interest and premium (due on the date callable), the right, title and interest of such trustees shall cease and the trust agreements released and the balances of funds delivered to the Authority." 416 P.2d at 876.

By issuing irrevocable instructions to the trustees to call the bonds for redemption and by insuring that the trustees held

sufficient moneys to pay the principal, interest, and a premium, if any, the outstanding bonds were defeased, the obligations of the trustees were terminated, and the operation of the trust agreements was terminated.

In analyzing the Oklahoma Turnpike Authority's rights and duties under the trust agreements, the Oklahoma Supreme Court stated:

"It is our opinion that the alternative provision of giving 'irrevocable instructions to call the bonds for redemption' coupled with the provisions for holding sufficient moneys to pay the principal, interest and (redemption) premiums, when considered in connection with the other parts of the quoted Section, can only be interpreted as an agreement or consent to advance refunding of the bonds.

"The Authority has or will give irrevocable instructions to call the bonds for redemption and has made provision that sufficient moneys be held for the purpose of paying the principal and the interest and the premium on all of the bonds when they become callable for redemption. These acts are in accord with the understanding expressed in the trust agreements. When the Legislature amended the statute in 1965, in the manner above set forth, it furnished the Authority an enlarged plan for refunding and furnished to the bondholders interim security for the safe and secure payment of the amounts due them when the bonds became redeemable. We fail to see wherein any security or rights have been impaired." 416 P.2d at 875.

In attempting to distinguish *Oklahoma Turnpike* from the present case, the defendants argue that the decision of the Oklahoma court related solely to the series 1961 and series 1963 bonds which, at the time of the decision, were not then callable by the turnpike authority without the payment of a redemption premium. The defendants argue that the Oklahoma court "was not asked to consider advanced refunding of the 1950 bond issue which was already callable, just like the KTA's 1954 Bonds." The distinction advanced by the defendants does not find support in the Oklahoma decision. The Oklahoma court's analysis of the turnpike authority's rights under the defeasance provisions of the three trust agreements is not limited to occasions where the outstanding bonds are callable only upon the payment of a redemption premium. Instead, the Oklahoma court's analysis applies with equal weight both to the immediately callable 1950 series bonds and the series 1961 and series 1963 bonds, which were non-callable. Moreover, the method of refunding approved by the Oklahoma court is inconsistent with the position advanced by the defendants. Although the series 1961 and series

1963 bonds were first callable for redemption on July 1, 1971, under the Oklahoma Turnpike Authority's refinancing plans, these bonds were not redeemed until November 15, 1971. Thus, at the time the series 1961 and series 1963 bonds were redeemed, the bonds were callable for redemption upon the payment of a five percent redemption premium. 416 P.2d at 873. We find no support in the *Oklahoma Turnpike* decision for the callable/non-callable distinction advanced by the defendants.

The defendants argue that, in *Oklahoma Turnpike*, the delay in the redemption of the series 1961 and series 1963 bonds from July 1 to November 15, 1971, is a "minor point." The delay, however, is an essential point, not a minor one. As discussed below, the defendants' interpretation of the Trust Agreement requires grafting the phrase "at the earliest redemption date" onto the defeasance provisions of § 1201. Thus, under the interpretation advanced by the defendants, *any delay* in redeeming the bonds would be impermissible. The action of the Oklahoma Turnpike Authority in failing to immediately redeem the series 1961 and series 1963 bonds, coupled with the refusal of the Oklahoma court to require the immediate refunding of the bonds "at the earliest redemption date" or to impose any time requirement upon the redemption of the bonds, supports the district court's reliance on *Oklahoma Turnpike* as persuasive authority in the present case.

The defendants next argue that the method of refunding adopted by the KTA violates § 307 of the Trust Agreement. Section 307 provides:

"Bonds and portions of bonds which have been duly called for redemption under the provisions of this Article, or with respect to which irrevocable instructions to call for redemption at the earliest redemption date have been given to the Trustee, in form satisfactory to it, and for the payment of the redemption price of which and accrued interest to the date fixed for redemption moneys shall be held by the Trustee or by the Paying Agents, in trust for the holders of the bonds or portions thereof to be redeemed, all as provided in this Agreement, shall not be deemed to be outstanding under the provisions of this Agreement."

However, as noted by the district court in its memorandum decision, § 307 is only definitional in nature and does not explicitly or implicitly limit the timing of a permissible defeasance under § 1201. The district court stated that § 307

"has absolutely nothing to do with redemption prior to maturity. This section tells us which bonds are 'outstanding' for voting purposes and simply and

logically provides that bonds which have been called for redemption at their earliest date and for which money has been set aside for payment are 'not outstanding' for these purposes. Likewise, there is absolutely no reason to read this language into Section 1201."

We find the interpretation adopted by the district court is correct. Section 307 simply defines which bonds shall be considered "outstanding" under the Trust Agreement. Section 307 does not provide a time limit for defeasance under § 1201. Section 1201 permits a defeasance by the issuance of irrevocable instructions to call for redemption. There is no basis for inserting the phrase "at the earliest redemption date" from § 307 into the defeasance provisions of § 1201.

In support of their argument that § 307 serves to control the ability of the KTA to defease prior obligations, the defendants rely upon *Ladt v. County of McCracken*, 555 S.W.2d 620 (Ky. App. 1977). However, *Ladt* is wholly inapplicable in the present case. In *Ladt*, the trust agreement did not include an express defeasance provision comparable to § 1201 of the 1954 Kansas Trust Agreement (or to the trust agreements discussed in *Oklahoma Turnpike*). The *Ladt* court was, therefore, required to resort to a provision of the Kentucky trust agreement which is comparable to § 307 to permit a release of prior obligations. *Ladt* has no application in the present case where the rules relating to defeasance are independently and explicitly set forth in § 1201.

Section 1201 of the Trust Agreement defines the parties' rights and obligations relating to the defeasance of prior turnpike obligations. The omission of the phrase "at the earliest redemption date" from the provisions of § 1201, although the phrase is used elsewhere in the Trust Agreement, clearly indicates that the parties entering into the Trust Agreement did not intend such a timing requirement to apply to § 1201.

The defendants next argue that the refinancing adopted by the KTA violates § 301 of the Trust Agreement. Section 301 deals with redemption of outstanding bonds and provides in part:

"The bonds issued under the provisions of this Agreement at the time outstanding may be redeemed prior to their maturity either

"(a) in whole, on any date not earlier than October 1, 1962, at the option of the Authority, from any moneys that may be made available for such purpose, at the principal amount of the bonds to be redeemed, together with the interest accrued thereon to the date fixed for redemption, plus a premium of 3% of such principal amount if redeemed on or prior to September 30, 1965, 2 ½% if redeemed thereafter and on or prior to September 30, 1968, 2% if

redeemed thereafter and on or prior to September 30, 1971, 1 ½% if redeemed thereafter and on or prior to September 30, 1974, 1% if redeemed thereafter and on or prior to September 30, 1977, ½ of 1% if redeemed thereafter and on or prior to September 30, 1980, and without premium if redeemed thereafter, or

"(b) in part, on any interest payment date not earlier than October 1, 1958, from moneys in the Kansas Turnpike Interest and Sinking Fund, at the principal amount of the bonds to be redeemed, together with the interest accrued thereon to the date fixed for redemption, plus a premium of 3% of such principal amount if redeemed on or prior to April 1, 1962, 2 ½% if redeemed thereafter and or on or prior to April 1, 1965, 2% if redeemed thereafter and on or prior to April 1, 1968, 1 ½% if redeemed thereafter and on or prior to April 1, 1971, 1% if redeemed thereafter and on or prior to April 1, 1974, ½ of 1% if redeemed thereafter and on or prior to April 1, 1977, and without premium if redeemed thereafter."

The defendants contend that the refinancing procedure adopted by the KTA violates § 301 because it complies with neither subsection (a) for a redemption in whole nor subsection (b) for a redemption in part. According to the defendants' argument, the refinancing was not a redemption in whole because the bonds were called in a series of installments; nor was the refinancing a redemption in part because the financing for the redemption was obtained by issuing new turnpike bonds and was not accomplished through the use of "moneys in the Kansas Turnpike Interest and Sinking Fund," reflecting accumulated turnpike revenues.

The district court correctly found that the 1984 refinancing was not prohibited by § 301. The district court stated: "[T]he call of the entire issue, albeit upon a redemption timetable, is a call of the 'whole' issue, as contemplated in Section 301(a) of the Trust." Under the 1984 refinancing plan, all outstanding 1954 series bonds are redeemed prior to maturity. The district court found that, under the refinancing plan, "[e]very single unpaid bond was accelerated in its maturity date by KTA's irrevocable instructions, some by several years." The district court did not err in concluding that the issuance of irrevocable instructions to call all outstanding bonds in a series of installments was a valid redemption in whole.

The defendants argue that the refinancing plan does not comply with the requirements of § 301(a) because this subsection uses the singular "date" and does not permit a series of calls. The defendants' argument is unpersuasive for several reasons. First, subsection (a) permits a redemption on "any date" after

October 1, 1962. The subsection thus uses language essentially identical to that contained within subsection (b) relating to partial redemptions, which obviously contemplates redemption upon more than one occasion even though the subsection also uses the term "date." That subsection (a) does not prohibit the 1984 refunding is also supported by a review of the purpose underlying § 301. Section 301(a) simply provides that outstanding 1954 series bonds may not be redeemed in whole prior to October 1, 1962; may be redeemed from October 1, 1962 to September 30, 1980, upon the payment of various designated premiums; or may be redeemed without premium "thereafter." The subsection does not directly prohibit the method of refunding adopted in the present case.

Moreover, § 301 does not remain an independent obligation of the KTA after defeasance. Once the KTA has complied with the requirements for defeasance under § 1201,

"the right, title and interest of the Trustee and of the Co-Trustee shall thereupon cease, determine and become void, and the Trustee and the Co-Trustee in such case, on demand of the Authority, shall release this Agreement and shall execute such documents to evidence such release as may be reasonably required by the Authority . . . ."

Thus, when defeasance occurs under § 1201, the independent provisions of the Trust Agreement, such as § 301, no longer serve as independent binding obligations on the KTA. As indicated above, the 1984 financing procedures adopted by the KTA comply with the requirements of § 1201. Having properly defeased the bonds under § 1201, the KTA no longer remains subject to the independent redemption requirements of § 301.

The defendants next contend that the 1984 refunding was improper because Morgan, as trustee, was not authorized to invest the money obtained by the refunding under § 602 of the Trust Agreement. However, while § 602, which sets forth the requirements for the various accounts to be maintained by the trustee, does not explicitly contain authorization for the trustee to invest obligations obtained by refunding the 1954 bonds, neither does § 602 explicitly prohibit the procedures used to obtain advance refunding.

Both the Trust Agreement and Kansas law implicitly recognize the ability of KTA and Morgan, as trustee, under the Trust Agreement to invest moneys obtained from refunding procedures. Section 1201 provides that defeasance may occur where

the principal, interest, and premium (if any) on outstanding bonds "shall be paid or sufficient moneys *shall be held* by the Trustee or the Paying Agents for such purpose under the provisions of this Agreement." Section 1201 thus implicitly authorizes the trustee to invest funds to be used in paying the outstanding obligations. In addition, Kansas statutory law recognizes the authority of the KTA to invest moneys obtained from the refunding plan. G.S. 1949, 68-2004(n) (1955 Supp.) granted authority to the KTA to "do all acts and things necessary or convenient to carry out the powers expressly granted in this act."

Finally, in 1982, the Kansas Legislature explicitly authorized the escrow investment of moneys obtained through refunding of the 1954 bonds. K.S.A. 68-2044. The Oklahoma Supreme Court, in *Oklahoma Turnpike*, dealt with the ability of the turnpike authority to rely upon legislative enactments passed subsequent to the trust agreements in issue. The Oklahoma court stated:

"At this point we observe that the outstanding bonds of the three named turnpikes were obviously issued prior to the 1965 amendment, but were issued under the statute prior to amendment which limited each refunding issue to the bonds of the project being refunded and limited the revenue pledged to the refunding bonds to that derived from the separate project. In view of this circumstance there may be some belief that the Authority may not rely upon the amended statute. Such belief is unfounded." 416 P.2d at 874.

The court concluded:

"When the Legislature amended the statute in 1965, in the manner above set forth, it furnished the Authority an enlarged plan for refunding and furnished to the bondholders interim security for the safe and secure payment of the amounts due them when the bonds became redeemable." 416 P.2d at 875.

We find that the 1984 refunding plan which set aside moneys for payment of the outstanding 1954 bonds was both implicitly recognized by the terms of the Trust Agreement and expressly supported by Kansas statutory law.

The second issue raised by the defendants is whether the district court relied upon improper and irrelevant facts in granting summary judgment. The defendants take issue with the district court's findings that the 1984 refunding "was necessary to carry out certain needed repairs and improvements" of the Kansas Turnpike; statements by the court regarding the 1984 IRS opinion letter finding that the refunding plan did not violate federal law; and finally, the court's statement that the defendants had originally filed their Illinois action after they had "deter-

mined that Illinois was the jurisdiction most likely to find in their favor."

These findings and statements were not factors in the district court's decision, which turned solely upon the terms of the 1954 Trust Agreement. The three facts which the defendants cite as irrelevant occurred during the course of the district court's "highly summarized" background statement of the case. In its legal analysis of the Trust Agreement, the district court explicitly indicated that it did not consider the IRS letter or the alleged necessity for the 1984 refunding to be controlling issues. The other allegedly irrelevant fact relates to the district court's conclusion that the defendants had originally filed suit in Illinois because they had concluded that it was the most favorable jurisdiction for their case. The district court's statement appears to be based upon defendant Barr Brothers' apparent solicitation of potential Illinois plaintiffs. On August 8, 1985, Barr Brothers ran an advertisement in the Wall Street Journal, stating: "AT-TENTION ILLINOIS RESIDENTS," urging all Illinois owners of 1954 Kansas Turnpike revenue bonds to contact Barr Brothers. In the present case, it is unnecessary to determine whether the district court's conclusion was or was not a reasonable inference from Barr Brothers' actions. A review of the district court's conclusions of law fails to indicate that it played any role in the basis for the district court's decision. Rather, the district court's decision turns solely upon the terms and provisions of the Trust Agreement.

The defendants, in their brief to this court, advance several items of parol evidence supporting their interpretation of the Trust Agreement. However, having reviewed the Trust Agreement and concluding that it was unambiguous, the district court properly refused to consider extrinsic evidence. *Brown v. Lang*, 234 Kan. 610, 675 P.2d 842 (1984); *Bailey v. Talbert*, 179 Kan. 169, 294 P.2d 220 (1956).

The defendants next contend that the district court erred in denying defendants permission to file counterclaims. The defendants filed their motion for permission to file counterclaims against the plaintiffs on June 26, 1987. The defendants sought to amend their answer to include counterclaims relating to breach of contract, breach of statutory contract, breach of fiduciary duty, federal securities laws violations, and common-law fraud. The

district court rendered summary judgment on plaintiffs' petition for declaratory relief on August 4, 1987. On November 17, 1987, the district court denied the defendants' motion for leave to file counterclaims, finding that the issue was "moot."

Counts I through III of the defendants' counterclaims (relating to breach of contract, breach of statutory contract, and breach of fiduciary duty) depend upon an interpretation of the 1954 Trust Agreement and whether the 1984 refunding was consistent with the terms of the Trust Agreement. The district court's conclusion that the 1984 refunding was proper effectively resolved these counterclaims against the defendants. However, Counts IV and V of the defendants' counterclaims (relating to federal securities laws violations and common-law fraud) also include allegations of independent intentional misrepresentations by the KTA. The resolution of the parties' rights and obligations under the 1954 Agreement does not, therefore, totally resolve the issues set forth by Counts IV and V. However, even if part of the allegations made in these two Counts were not "moot," the defendants' counsel informed the district court at pretrial that no claim for fraud would be made in this case. In addition, this action was commenced on April 10, 1986, followed by extensive pretrial discovery and a pretrial conference which was held on June 19, 1987. The defendants' motion to file their counterclaims was not filed until June 26, 1987, over fourteen months after this action was commenced. The district court has discretion to deny the motion as untimely. We find no error in the trial court's denying the defendants permission to file their counterclaims.

Finally, the defendants argue that the district court erred in its conclusion that they were subject to personal jurisdiction in Kansas. The defendants first argue that the district court erred in concluding that the defendants fell within the provisions of the Kansas long-arm statute, K.S.A. 1987 Supp. 60-308.

The relevant portion of the Kansas long-arm statute provides:

"Any person, whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the acts hereinafter enumerated, thereby submits the person and, if an individual, the individual's personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of these acts:

. . . .

"(5) entering into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state." K.S.A. 1987 Supp. 60-308(b).

The defendants contend that 60-308(b)(5) does not apply to them in the present case since, as bondholders, they "are only third party beneficiaries under the Trust Agreement." We disagree. The defendants possess enforceable contractual rights under the Trust Agreement, and have sought to enforce those rights both in Illinois and in the present action. The defendants voluntarily purchased bonds issued by a public agency of the State of Kansas and, thus, became creditors of that agency. The Trust Agreement provides that it is intended to be "for the sole and exclusive benefit of the parties hereto and the holders from time to time of the bonds issued hereunder," and grants enforceable contractual rights to the bondholders. In their Illinois complaint, the defendants alleged that the plaintiffs owe "fiduciary and contractual duties to the Bondholder Class." The defendants' argument that they have not entered into an express or implied contract is without merit.

The defendants also argue that the district court's exercise of personal jurisdiction in the present case is a violation of due process. The constitutional limitations upon the exercise of personal jurisdiction were reviewed by the United States Supreme Court in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). In *Burger King*, the Supreme Court restated the requirement that due process requires a demonstration that the nonresident defendant purposely established minimum contacts with the forum state, thereby invoking the benefits and protections of its laws. 471 U.S. at 474-75.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' *International Shoe Co. v. Washington*, 326 U.S., at 320. Thus courts in 'appropriate case[s]' may evaluate 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.' *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S., at 292. These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. See, *e.g., Keeton v. Hustler Magazine, Inc.,* [465 U.S.] at 780; *Calder v. Jones,* [465 U.S.] at 788-89; *McGee v. International Life Insurance Co.,* [355 U.S.] at 223-24. On the other hand, where a defendant who

purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." 471 U.S. at 476-77.

In the present case, two courts in Illinois and one court in Kansas have concluded that Kansas was a proper jurisdiction for the resolution of the present controversy. A review of the facts present in the case fails to reveal that this conclusion was erroneous. Each bond contains the statement that "the holder hereof assents to all of the provisions of the [1954 Trust] Agreement." The Trust Agreement is governed by Kansas law and the bonds issued under the Trust Agreement are secured by a lien on Kansas Turnpike revenues. All financial accounts held by the KTA are within the State of Kansas.

The defendants also contend that their purchase of the turnpike revenue bonds was solely a "passive investment activity." However, the record fails to support this characterization of the defendants' activities. In deciding whether to buy or sell 1954 series bonds, agents of defendant Barr Brothers regularly telephoned KTA officers in Kansas for information relating to the bonds. Defendant Wheeler wrote to the KTA in 1981, requesting financial information. Both defendants requested records from the KTA pursuant to the Kansas Open Records Act, K.S.A. 45-215 *et seq.*, and inspected documents in Kansas pursuant to the terms of the 1954 Trust Agreement. These investigations by the defendants were not made pursuant to discovery in the course of Kansas litigation, and were made at the time discovery in the Illinois case was limited to the issue of personal jurisdiction.

In concluding that the defendants may properly be subjected to jurisdiction in Kansas, the district court stated in its memorandum decision:

"First, it is clear that the defendants voluntarily purchased a number of KTA Series 1954 Bonds. The defendants knew that these bonds were issued by a governmental entity of the State of Kansas and were secured by a lien on revenues to be generated from assets located in Kansas. Furthermore, the Kansas tollway is a creature of Kansas law and the KTA Series 1954 Bonds were a tax-free investment in Kansas. Certainly the above facts indicate that the defendants created continuing obligations between themselves and residents of Kansas, and have availed themselves of the privileges and benefits of Kansas law."

. . . .

"Applying these factors, the Court finds sufficient minimum contacts. Regarding contemplated future consequences, if the defendants in this case were to enforce their rights as lienholders, they would have to sue in Kansas, where all

the secured property is. Furthermore, in examining the terms of the contract, the Trust Agreement contains a choice of law provision designating Kansas as the forum state. 'Although such a provision standing alone would be insufficient to confer jurisdiction,' it does reinforce the defendants' 'deliberate affiliation' with Kansas and the 'reasonable foreseeability of possible litigation' here. *Burger King*, 471 U.S. at 482.

"Finally, what distinguishes the defendants in this case from all other KTA Series 1954 Bondholders, is that the defendants have filed a claim alleging a possible violation of the 1954 Trust Agreement. By doing so, they have invoked the choice of law provision of the Trust Agreement. Moreover, they have initiated a controversy over the 1954 bond issuance, which involves a Kansas co-trustee and paying agent, a security interest in Kansas property, and benefits under Kansas law. Certainly the defendants could foresee being haled into a Kansas court. Indeed, if they prevail, they will have to come here to enforce their lien. As a result the facts show that the defendants have established sufficient minimum contacts with the State of Kansas and have purposefully availed themselves of the privileges of conducting business in Kansas.

"Once it has been decided that the defendants purposefully established minimum contacts with Kansas, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice. *Burger King*, 471 U.S. at 476. These factors include 'the forum state's interest in adjudicating the dispute,' and 'the plaintiff's interest in obtaining convenient and effective relief.' [*Burger King*] at 477.

"Applying these factors, it is clear that Kansas has an interest in resolving a dispute over the KTA tollway, a creature of Kansas law, and an essential highway to the economy of Kansas. All the assets of the KTA are located in Kansas and, furthermore, Kansas law controls on the substantive issues of this case.

"The interests of the parties would also be best served by resolving this dispute in Kansas. Almost all sources of proof and most of the witnesses are in Kansas. Also, the defendants have not demonstrated that they would be subject to enough hardships to render jurisdiction in Kansas unreasonable. Therefore, for the foregoing reasons, the assertion of personal jurisdiction by the State of Kansas over the defendants does not offend any 'traditional notions of fair play and substantial justice.' "

The district court was correct in concluding that Kansas was a proper forum for the resolution of the present controversy and in asserting personal jurisdiction over the defendants.

In view of our decision herein, it is not necessary to address the issue concerning the trustee's and co-trustee's immunity based upon their good faith reliance upon the opinion of counsel.

Finding no error, we affirm the judgment of the district court.

MILLER and HOLMES, JJ., not participating.